PALENKAS v BEAUMONT HOSPITAL

Docket Nos. 82083, 82087. Argued December 7, 1988 (Calendar No. 4). Decided June 7, 1989.

Brian Palenkas brought a medical malpractice action in the Oakland Circuit Court against William Beaumont Hospital and Dr. James M. Lawson, and later alleged failure to discover the claim within the statutory period of limitation. The hospital asserted as an affirmative defense that the plaintiff's complaint was untimely, but did not move at that time for accelerated judgment on the basis of the expiration of the statute of limitations. The plaintiff settled with Dr. Lawson prior to trial. At the conclusion of the plaintiff's case in chief, the hospital moved for accelerated judgment on the ground that the plaintiff's proofs had failed to substantiate that the case was brought within six months of the claim's discovery. The court, Hilda R. Gage, J., reserved ruling on the motion. Upon the return of the jury's verdict, the court denied the defendant's motion for accelerated judgment on the ground that it had failed to raise the matter prior to the trial, and entered judgment for the plaintiff minus a setoff for the amount of Dr. Lawson's settlement. The court also granted a remittitur, reducing the final judgment. The Court of Appeals, BEASLEY, P.J., and HOLBROOK, JR., and D. L. SULLIVAN, JJ., reversed the order of remittitur, affirmed the trial court's ruling prohibiting cross-examination of Dr. Lawson with regard to the settlement agreement with the plaintiff, and remanded the case for a determination of the statute of limitations issue on its merits (Docket No. 82496). Both parties appeal.

In an opinion by Chief Justice RILEY, joined by Justices LEVIN, BRICKLEY, CAVANAGH, BOYLE, and GRIFFIN, the Supreme Court *held*:

The record is insufficient to permit a finding of abuse of discretion on the part of the trial court in denying the defendant hospital the right to cross-examine the defendant physician regarding the pretrial settlement agreement with the plaintiff. The trial court did not err in its decision to deny the hospital's motion for accelerated judgment under the statute of limitations. The trial court did not abuse its discretion in remitting the jury's award.

1. GCR 1963, 111.7, the rule applicable in this case, required

inclusion of all affirmative defenses in a party's responsive pleadings under a separate and distinct heading along with facts to support it. In addition, GCR 1963, 116.1 required that a demand for accelerated judgment on the basis of the statute of limitations either be included in a party's first responsive pleading or be filed at the same time. The party asserting the defense had the burden of introducing evidence in its support. In this case, because the defendant failed to raise the issue of the statute of limitations in a pretrial motion for accelerated judgment, to allege facts in its answer or to submit an affidavit or other evidence before trial to rebut the plaintiff's allegation regarding discovery of the defendant's malpractice, and to present evidence on this issue in its case in chief, the defendant abandoned its affirmative defense of the expiration of the statute of limitations. Thus, the trial court correctly denied the motion for accelerated judgment.

2. Appellate review of the permissible scope of cross-examination on a collateral matter is limited to determining whether the trial court abused its discretion. In this case, the sparsity of the trial court record precludes appellate review of the nature and treatment of the defendant's motion regarding impeachment of Dr. Lawson or the making of a full analysis of his testimony. On the basis of the trial court's analysis of Dr. Lawson's testimony and his lack of financial interest in the ultimate outcome of the jury's verdict regarding the hospital, it can be concluded that his testimony was sufficiently reliable. Thus, there was no clear error in the holding of the Court of Appeals that the trial court did not abuse its discretion in denying the hospital the opportunity to cross-examine Dr. Lawson regarding the settlement.

3. The question of the excessiveness of a jury verdict generally is one for the trial court in the first instance. The trial court, having witnessed all the testimony and evidence as well as having had the unique opportunity to evaluate the jury's reaction to the proofs and to the individual witnesses, is in the best position to make an informed decision regarding the excessiveness of the verdict. An appellate court must accord due deference to the trial court's decision and may only disturb a grant or denial of remittitur if a clear abuse of discretion is shown. The standard applies whether the review is by the Court of Appeals or the Supreme Court. Under MCR 2.611(E)(1), remittitur is justified if the jury verdict is excessive, i.e., if the amount awarded is greater than the highest amount the evidence will support. A trial court's inquiry should be limited to objective considerations relating to the actual con-

duct of the trial or to the evidence adduced. An inquiry which employs the "shock the conscience" standard is inappropriate because it merely involves an expression of the trial judge's personal values and subjective beliefs and in no way relates to the actual conduct of the trial. Significantly more objective are inquiries whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; and whether the amount actually awarded is comparable to awards in similar cases. Each is potentially verifiable in the record and provides at least some basis for appellate review.

Affirmed in part and reversed in part.

Justice ARCHER stated further that where a jury's verdict has been reduced by a trial court remittitur and reinstated by the Court of Appeals, the Supreme Court should review the case to determine whether the Court of Appeals erred in finding an abuse of discretion by the trial court in ordering remittitur. In this case, the Court of Appeals did not err in finding an abuse of discretion on the part of the trial court.

Appellate review of a grant or denial of remittitur is limited to the determination of whether an abuse of discretion occurred. Generally an appellate court will determine whether there has been an abuse of discretion by deciding whether the verdict was excessive or was supported by the proofs; whether it was the result of prejudice, passion, partiality, sympathy, or corruption; or whether its size shocks the judicial conscience. A court should be reluctant to disturb a jury verdict for personal injuries upon the ground that it is excessive.

In evaluating a jury verdict for possible remittitur, the court should review the verdict in the light most favorable to the plaintiff. When the verdict is based in part upon pain and suffering, the court must balance all of the factors involved against the general principle that there is no absolute mathematical formula or standard by which pain and suffering can be measured. Thus, the amount allowed for pain and suffering ordinarily must rest in the sound judgment of the jury.

In this case, the plaintiff introduced substantial evidence regarding the immense pain and suffering experienced by him, as well as the continuing pain and suffering he will experience throughout his life, all resulting from the irreparable damage caused by the defendant's malpractice. The defendant introduced no testimony to directly rebut that evidence. Although the trial court expressly disavowed substitution of its judgment

for that of the trier of fact, it is clear from the record that is what occurred. The plaintiff's evidence substantially supported the jury verdict, thereby rendering the trial court's order of remittitur an abuse of discretion. Because the trial court clearly substituted its judgment for that of the jury in evaluating the plaintiff's damages, the Court of Appeals correctly reversed the trial court's order of remittitur.

162 Mich App 271; 412 NW2d 709 (1987) affirmed in part and reversed in part.

*Fieger & Fieger, P.C.* (by *Geoffrey N. Fieger*), for the plaintiff.

*Sullivan, Ward, Bone, Tyler, Fiott & Asher, P.C.* (by *Michelle A. Thomas*), for defendant William Beaumont Hospital.

Amici Curiae:

*George James Platsis, P.C.,* for Ralph McManus.

*Siemion, Huckabay, Bodary, Padilla & Morganti, P.C.* (by *Raymond W. Morganti*), for Michigan Defense Trial Counsel.

*Kerr, Russell & Weber* (by *Richard D. Weber* and *Joanne Geha Swanson*) for Michigan State Medical Society.

*Plunkett & Cooney, P.C.* (by *John P. Jacobs* and *Robert G. Kamenec*), for St. Joseph Hospital Corporation.

RILEY, C.J. We concur in sections I and II of Justice ARCHER's opinion. However, we disagree with his resolution of the remittitur issue in section III.

Justice ARCHER's opinion does not make clear whether the Court should review the trial court's decision on remittitur for an abuse of discretion or whether it should review the Court of Appeals

decision for clear error. In our view, the question of the excessiveness of a jury verdict is generally one for the trial court in the first instance. The trial court, having witnessed all the testimony and evidence as well as having had the unique opportunity to evaluate the jury's reaction to the proofs and to the individual witnesses, is in the best position to make an informed decision regarding the excessiveness of the verdict. Accordingly, an appellate court must accord due deference to the trial court's decision and may only disturb a grant or denial of remittitur if an abuse of discretion is shown. This standard applies whether the review is by the Court of Appeals or the Supreme Court.

Having examined the record in the instant case and having conferred upon the trial court the requisite deference, we cannot conclude that the court abused its discretion in remitting the jury verdict to $800,000.

I

A trial court's order of remittitur is governed by MCR 2.611(E)(1):

> If the court finds that the only error in the trial is the inadequacy or excessiveness of the verdict, it may deny a motion for new trial on condition that within 14 days the nonmoving party consent in writing to the entry of judgment in an amount found by the court to be the lowest (if the verdict was inadequate) or *highest (if the verdict was excessive) amount the evidence will support.* [Emphasis added.]

According to the express language of the court rule, remittitur is justified if the jury verdict is "excessive," i.e., if the amount awarded is greater than "the highest amount the evidence will sup-

port." As Justice Archer's opinion exemplifies, however, trial courts, in addition to evaluating whether a jury award is supported by the proofs, have conducted a myriad of other inquiries in determining whether remittitur would be proper in a particular case: 1) whether the verdict "shocks the judicial conscience"; 2) whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; 3) whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; 4) whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions. 22 Am Jur 2d, Damages, §§ 1021-1025, pp 1067-1075. *Precopio v Detroit,* 415 Mich 457, 465; 330 NW2d 802 (1982); *Stevens v Edward C Levy Co,* 376 Mich 1, 5-6; 135 NW2d 414 (1965); *Majewski v Nowicki,* 364 Mich 698, 700; 111 NW2d 887 (1961).

The only consideration *expressly* authorized by MCR 2.611(E)(1), however, is whether the jury award is supported by the evidence. While we agree with the established case law that a trial court, in making a decision on remittitur, should examine a number of factors (such as whether the verdict was induced by bias or prejudice), we believe its inquiry should be limited to *objective* considerations relating to the actual conduct of the trial or to the evidence adduced.

The "shock the conscience" inquiry is an inappropriate consideration since it merely involves an expression of the trial judge's personal values and subjective beliefs and in no way relates to the actual conduct of the trial. As we have learned in reviewing sentencing issues under *People v Coles,* 417 Mich 523; 339 NW2d 440 (1983), what shocks the conscience of one judge does not necessarily

shock the conscience of another. Justice ARCHER's opinion seemingly advocates the continued use of the "shock the conscience" test in remittitur cases. Because we view this inquiry to be one of complete subjectivity, we hold that it is not to be undertaken in any analysis relating to remittitur.

The other inquiries set forth above are significantly more objective than the "shock the conscience" test. Each consideration is potentially verifiable in the written record and, therefore, provides at least some basis for appellate review.

II

As Justice ARCHER's opinion explains, it is well established in Michigan case law that an appellate court may not disturb a trial court's order of remittitur unless it determines that there has been an abuse of discretion. *Hines v Grand Trunk W R Co,* 151 Mich App 585; 391 NW2d 750 (1985); *Jenkins v Southeastern Michigan Chapter, American Red Cross,* 141 Mich App 785; 369 NW2d 223 (1985).

Although no Michigan court has so stated, other jurisdictions have expressly held that once the issue of the excessiveness of a jury verdict has been squarely presented to a trial judge, who heard and considered the evidence, neither the state's highest nor its intermediate appellate court may substitute its judgment on excessiveness for that of the trial judge unless the latter is shown to be an abuse of discretion. *Davis v Graviss,* 672 SW2d 928, 933 (Ky, 1984); *Marquardt v Kansas C S R Co,* 358 SW2d 49, 58 (Mo, 1962) (an appellate court should be more reluctant to reduce the amount of damages awarded to a plaintiff in a personal injury action where the trial court has already acted by reducing the jury's verdict by remittitur).

An appellate court reviewing a trial court's grant or denial of remittitur must afford due deference to the trial judge since the latter has presided over the whole trial, has personally observed the evidence and witnesses, and has had the unique opportunity to evaluate the jury's reaction to the witnesses and proofs. Accordingly, the trial judge, having experienced the drama of the trial, is in the best position to determine whether the jury's verdict was motivated by such impermissible considerations as passion, bias, or anger. Deference to the trial judge simply reflects the recognition that the trial judge has observed live testimony while the appellate court merely reviews a printed record.

In granting remittitur in the instant case, the trial court considered each of the aforementioned factors on the record and concluded that the verdict was beyond the range of evidence:

> Lastly, the Court, in reviewing this matter reviewed its notes and does not take this matter lightly.
>
> I have indicated that, because Kenneth Gibcan, communicated to counsel some of which has apparently come back in the form of briefs and pleadings. *It's not a matter of substituting my judgment. The Court has never done that before, but in this situation, the Court could only, upon what it saw and heard in the court, cannot say an award in this Court's opinion was within the range of evidence.*
>
> It did shock the judicial conscious [sic]. The Court believes that this jury was inflamed and was angry. Perhaps it was because the hospital really offered no other witnesses other than the attending doctor. The doctor was not on trial, but the jury was angry.
>
> The jury, I believe in my opinion, listening to that doctor found him arrogant and conceited and listening to him was inflaming the jury.

Beyond that, the Court heard the evidence. The Court finds that plaintiff's counsel has accurately quoted much of the evidence. The Court found that the plaintiff did suffer severe, acute pains at the time he had the surgeries. Some of the surgeries which, obviously, had to be performed to begin with based on other matters totally unrelated to the hospital or hospital doctor.

The Court finds that he did satisfy the jury as to the point that he suffered then. But as to plaintiff's claim that he has suffered a severe disfigurement and disability, this Court observed that young man and he's not the kind of young man who has his face all scarred up or anything.

As a matter of fact, he is a good-looking young man. He's got a slight flattening of the jaw on one side at the most, but we are not dealing with a situation where he burned his face or somebody that if anyone looked at, would grimace.

I heard him testify. He talked fine. He was functioning fully. He attends school. He workds [sic]. He has a very full day. This is not [a] situation of a disabled individual that can no longer function in society. He functions completely and is not the kind of person that anyone would turn their heads and might say, what happened to him. He would just blend right in with any crowd.

With regards to continuing pain, the doctors described that what he is suffering right now is a chronic type of discomfort that goes along with malocclusions. It's a nuisance problem is what they testified to.

With these considerations in mind, with what the Court heard and so forth, and with the considerations that by reducing the award to 8 hundred thousand, he still has a very nice income for the rest of his life.

The Court feels that remitt[it]ur is appropriate and I will remit into the sum of $800,000. [Emphasis added.]

The trial court on the record stated explicitly

that the evidence did not support the $1.25 million
verdict awarded in this case. In support of this
decision, the judge cited the fact that Mr. Palenkas
was still a very good-looking man, that his face
was only slightly asymmetrical, and that he was
now living a fully functional lifestyle. The court
also highlighted the fact that the plaintiff's own
expert testified that the discomfort that he was
experiencing in his jaw was not permanently dis-
abling or incapacitating. These evaluations regard-
ing the permanency of the plaintiff's actual physi-
cal and emotional injuries were made possible by
the trial judge's presence throughout the trial.

The trial court was also firmly convinced that
the excessive nature of the jury verdict resulted in
part from the jurors' anger at Dr. Lawson. Justice
ARCHER acknowledges this fact, but states that
"[t]he trial court points to no specific statements
by Dr. Lawson or misconduct by trial counsel
during his testimony that would engender the type
of passion or bias necessary to interfere with a
jury verdict. Nor does our review of his testimony
reveal any source of undue prejudice." *Post,* p 564.
We are unaware of any requirement that the trial
judge cite specific statements which would un-
equivocally display a witness' perceived arrogance.
Imposing such a requirement would be both im-
practical and imprudent. Intangible emotions like
prejudice, bias, and anger are often undetectable
in a written record, and it is for this precise
reason that we defer to the trial court's judgment.

In any event, our review of Dr. Lawson's testi-
mony reveals a number of statements from which
the jury could have perceived him as arrogant and
conceited:

*Q.* Doctor, during the—from January 29, 1977
(sic) to January 4, 1978, that six day period of

time, you didn't ask anyone at Beaumont Hospital to take over the care and treatment of Mr. Palenkas' jaw fractures, did you?

*A.* No, as far as I know there was nobody there competent to do it.

*Q.* You were the one who was competent to do it; is that right?

*A.* Right.

*Q.* And if you were going to leave or stop treating your patient, you would make sure that there was a responsible person treating the patient?

*A.* Not necessarily. If things are going right, and there's no other indication, you don't have to come in everyday and see him.

Because an appellate court has only the written record to examine, it can only speculate about the jury's actual reaction to testimony such as this. Accordingly, we are obliged to give the trial court the benefit of the doubt.

In arguing that the trial court abused its discretion in ordering remittitur in this case, Justice ARCHER's opinion cites jury awards in similar cases (decided within the past ten years approximately) where plaintiffs incurred serious facial injuries. *Post,* p 561, n 26. Justice ARCHER, however, has refused to compare those awards to the verdict awarded in the instant case as required by recent case law, *Precopio, supra,* stating:

> The question presented did not, however, allow this Court to substitute its judgment for that of the trier of fact below. The cited cases, while similar, could never present the same facts and evidence as that heard by the trier of fact below. They provide insufficient justification for this Court to superimpose its will in derogation of the principle of trial by jury on the basis of the cold record here reproduced. [*Post,* p 564.]

We recognize that none of the fifteen facial

injury cases cited by Justice ARCHER presents the identical facts and evidence as that heard by the jury in the instant case. We also recognize that this Court may not substitute its judgment on damages for that of the jury. Nonetheless, a comparison of jury awards in analogous facial injury cases is warranted here. While such a comparison cannot serve as an exact indicator, it does provide an objective means of determining the range of appropriate awards in such cases.

Having examined the facial injury cases cited by Justice ARCHER, we find that the low end of the range hovers near $100,000-$150,000,[1] the high end near $800,000.[2] Most of the jury awards for analogous facial injuries fall somewhere between $275,000 and $600,000.[3]

Justice ARCHER's opinion cites two facial injury cases in the million-dollar-plus category. *Detroit Marine Engineering v McRee,* 510 So 2d 462 (Miss, 1987) ($1,000,000 awarded); *Sweatt v Norman,* 283 SC 443; 322 SE2d 478 (1984) ($1,500,000 awarded). An examination of these cases, however, demonstrates that the injuries suffered by those plaintiffs were not limited to the face and jaw and were significantly more severe than those suffered by Mr. Palenkas.[4] The plaintiffs in both *Detroit Ma-*

---

[1] *Phillips v Schoenberger,* 369 Pa Super 52; 534 A2d 1075 (1987); *Coulter v Michelin Tire Corp,* 622 SW2d 421 (Mo App, 1981); *Gulf Life Ins Co v McCabe,* 363 So 2d 846 (Fla App, 1978).

[2] *Rowan v Nassau Co,* 91 AD2d 608; 456 NYS2d 418 (1982).

[3] *Brown v Penrod Drilling Co,* 534 F Supp 696 (WD La, 1982); *Aubert v Aubert,* 129 NH 422; 529 A2d 909 (1987); *Broom v Southeastern Hwy Contracting Co,* 291 SC 93; 352 SE2d 302 (1986); *Brennan v New York City,* 108 AD2d 834; 485 NYS2d 339 (1985); *Hardeman v Mendon Leasing Corp,* 58 NY2d 892; 460 NYS2d 499; 447 NE2d 47 (1983); *Gasquet v Commercial Union Ins Co,* 391 So 2d 466 (La, 1980); *Allied Industrial Int'l, Inc v Placencio,* 685 SW2d 364 (Tex App, 1984); *Armellini Express Lines of Florida v Ansley,* 605 SW2d 297 (Tex Civ App, 1980); *Tomei v Bloom Associates, Inc,* 75 Mich App 661; 255 NW2d 727 (1977).

[4] The plaintiff in *Detroit Marine, supra* at 471,

*rine* and *Sweatt* required more surgery and medical treatment than did the plaintiff here. Furthermore, unlike Mr. Palenkas, the plaintiffs in those cases have suffered serious and permanent disfig-

> suffered a myriad of injuries, including lacerations above his right eye and depressed fractures of the right side of his forehead, his right cheekbone, and his right orbit. In addition, his nasal bone had been broken. He underwent extensive surgery; first, to correct the pressure on his brain in which a small hole was drilled in his skull to alleviate the situation; and second, to rectify the damage to his facial area in which his skull fracture was elevated, his upper orbit repaired, the floor of his lower orbit replaced with a plastic insert, and his cheekbone moved and set. In all, McRee underwent a total of six operations, and these, coupled with the cost of his hospital stay, totaled almost $18,000.
>
> Testimony by the surgeons and other doctors involved in McRee's case revealed that because of his injuries incurred, while extensive correctional surgery had been committed on his person, appellee would continue to experience "an undefinable mild blunting" of his judgment and a certain euphoric feeling at times in his day-to-day existence.
>
> Further testimony showed that appellee had lost $17,000 in wages from being out of work as a truck driver for 13 months while recuperating, but has since returned to his former line of work, albeit with a different trucking line. Apparently, appellee receives the same salary now as he did before the accident, but he complains of having double vision when looking to the extreme right or left, which he believes is detrimental to his driving a truck and may in the long term affect his job as far as future promotions and/or salary raises are concerned.

In *Sweatt, supra* at 447, the plaintiff's

> right foot was nearly severed. She sustained a fracture to her right kneecap and right thighbone. A rod was placed through her buttocks and down through the marrow of her right thigh and remained there for about a year. Her orthopedic surgeon estimated that she has suffered a 50 percent residual loss of function of her right leg and that she now suffers from post-traumatic arthritis. She limps and has to wear a lift in her right shoe. She sustained multiple head and facial injuries, including numerous extensive lacerations, a comminuted nasal fracture, a cheekbone fracture and fractures of her lower jaw and mandible. According to her maxillofacial surgeons, she underwent extensive reconstructive surgery to her face. Unquestionably, the plaintiff suffered excruciating pain. She was hospitalized for six weeks, ten days of which was in intensive care. Her medical bills exceeded $40,000.

urements and will continue to suffer profound residual effects. While we do not intend to minimize the severity of Mr. Palenkas' injuries, we do mean to highlight the obvious distinctions between the instant case and those discussed above.

Accordingly, having examined the record in the case at bar and having conferred upon the trial court the requisite deference, we cannot conclude that the court abused its discretion in remitting this jury award to $800,000, a figure which represents the highest amount awarded in analogous facial injury cases during the past ten years.

LEVIN, BRICKLEY, CAVANAGH, BOYLE, and GRIFFIN, JJ., concurred with RILEY, C.J.

ARCHER, J. We granted leave to appeal, limited to the following issues: (a) what is the standard of review where the jury's verdict has been reduced by a trial court remittitur and reinstated by the Court of Appeals; (b) under that standard, should the jury's verdict or the remittitur stand as the judgment in the instant case; (c) was the defendant hospital improperly denied the right to fully cross-examine the defendant physician; (d) did the Oakland Circuit Court err in its decision to deny the defendant hospital's motion for accelerated judgment under the statute of limitations; and (e) if the Court of Appeals is correct that a remand for further proceedings is necessary to determine the applicability of the statute of limitations, what is the appropriate procedure to follow on remand?[1]

Where a jury's verdict has been reduced by a trial court remittitur and reinstated by the Court of Appeals, this Court should review the case to determine whether the Court of Appeals erred in finding an abuse of discretion by the trial court in

---

[1] *Palenkas v William Beaumont Hosp*, 430 Mich 891 (1988).

ordering remittitur. In this case, the Court of Appeals did not err in finding an abuse of discretion on the part of the trial court.

The trial court did not abuse its discretion in denying defendant hospital the right to cross-examine the defendant physician regarding his pretrial settlement agreement with plaintiff.

The Oakland Circuit Court did not err in its decision to deny defendant hospital's motion for accelerated judgment under the statute of limitations. This obviates the need to remand for further proceedings. Therefore, we do not reach the question regarding the appropriate procedure to follow on remand.

### FACTUAL AND PROCEDURAL BACKGROUND

On December 21, 1977, plaintiff Brian Palenkas was involved in a car accident that resulted in several serious traumatic injuries. Mr. Palenkas was taken to the emergency room at William Beaumont Hospital in Troy where he received treatment from a team of specialists who were called in by the defendant hospital. Among the physicians treating the plaintiff was Dr. James Lawson, a plastic surgeon, who was called in specifically to treat Mr. Palenkas' severely fractured lower jaw and injured teeth.

Dr. Lawson assumed primary responsibility for treatment of plaintiff's jaw. It was undisputed at trial that during plaintiff's stay in the hospital Dr. Lawson was absent from the hospital for several days.[2] In this period, the plaintiff's condition worsened: his jaw began to collapse inward as a result

---

[2] It was not conclusively established at trial whether Dr. Lawson had notified the hospital that he would be unavailable for several days; however, there was unrebutted testimony that no one at the hospital was qualified to care for plaintiff's facial injuries during this interval.

of improper immobilization; a loose tooth was left undetected inside plaintiff's jaw;[3] and another tooth became so loose that plaintiff, fearing he would choke on it, called a nurse to have it removed.

Following plaintiff's January 1978 discharge from the hospital, Dr. Lawson continued to treat his jaw injuries. After several months, however, plaintiff sought the help of a dentist, Dr. Mayer.[4] After his examination of the plaintiff, Dr. Mayer explained to the plaintiff that his jaw had collapsed and referred him to an oral surgeon, Dr. Osborn, for reconstructive surgery.

Dr. Osborn first examined the plaintiff in September, 1978. He found that plaintiff had a deficient bite, a misshapened face, broken teeth that had not been removed, sequestered pieces of bone in his front lower jaw, and a tooth intruding into his jawbone. He also found that plaintiff's right lower jaw had tipped inward and that this collapse prevented proper alignment of the teeth in plaintiff's mouth.

Over the course of the next three years Dr. Osborn performed three surgical procedures on the plaintiff. These procedures included removing the sequestered pieces of bone and the broken and loose teeth, sawing plaintiff's jaw apart and grafting a piece of bone from plaintiff's hip to his jaw, and repositioning his jaw.[5] The last such surgical

---

[3] This tooth was not discovered for several months. By then it had become embedded in plaintiff's lower jawbone area.

[4] There was conflicting testimony as to the reason for the initial visit to Dr. Mayer. Plaintiff testified that he went to the dentist because he continued to experience pain, shifting of his jaw, twisting and turning of his teeth, and the presence of floating fragments of bone in his mouth. Both plaintiff and Dr. Lawson also testified, however, that Dr. Lawson recommended routine follow-up treatment by a dentist, causing plaintiff to seek the care of Dr. Mayer.

[5] After the second and third operation, plaintiff's jaw was wired closed for six to eight weeks.

procedure took place in September, 1981. Subsequently, over the next one and one-half years, Dr. Mayer, plaintiff's dentist, resumed treatment and performed prosthetic reconstruction on plaintiff's teeth.

On October 27, 1982, plaintiff filed a complaint in Oakland Circuit Court, alleging that Beaumont and the defendant physician had been guilty of medical malpractice. Plaintiff's amended complaint alleged that he did not discover the malpractice until October, 1982. The purpose of this allegation was to avoid the two-year limitation period set forth in MCL 600.5805; MSA 27A.5805[6] by qualifying under the six-month discovery rule found in MCL 600.5838(2); MSA 27A.5838(2).[7] Beaumont included in its answer to the plaintiff's

[6] At the time of trial, § 5805 provided:

(1) A person shall not bring or maintain an action to recover damages for injuries to persons or property unless, after the claim first accrued to the plaintiff or to someone through whom the plaintiff claims, the action is commenced within the periods of time prescribed by this section.

* * *

(4) The period of limitations is 2 years for an action charging malpractice.

[7] At the time of trial, § 5838(2) provided:

(1) A claim based on the malpractice of a person who is, or holds himself out to be, a member of a state licensed profession, intern, resident, registered nurse, licensed practical nurse, registered physical therapist, clinical laboratory technologist, inhalation therapist, certified registered nurse anesthetist, x-ray technician, hospital, licensed health care facility, employee or agent of a hospital or licensed health care facility who is engaging in or otherwise assisting in medical care and treatment, or any other state licensed health professional, accrues at the time that person discontinues treating or otherwise serving the plaintiff in a professional or pseudoprofessional capacity as to the matters out of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim.

(2) An action involving a claim based on malpractice may be commenced at any time within the applicable period prescribed

complaint an affirmative defense that the complaint was untimely. Beaumont did not, however, file a separate pretrial motion for accelerated judgment on the basis of the expiration of the statute of limitations. Plaintiff settled with Dr. Lawson prior to trial.

The case was tried in June, 1984. At the conclusion of plaintiff's presentation of its case in chief, the defendant hospital moved for accelerated judgment on the ground that plaintiff's proofs had failed to substantiate that the case fell within the six-month discovery rule. The trial judge reserved her ruling on the motion. In its case in chief, the hospital did not introduce any evidence to negate plaintiff's allegation that he first discovered the relationship between the defendant's negligence and his injuries in October, 1982.[8]

The jury reached a verdict in favor of the plaintiff, awarding damages in the amount of $1,250,-000. The court entered judgment in the amount of $1,050,000, reflecting a setoff of $200,000 previously paid to the plaintiff by Dr. Lawson in a settlement agreement prior to the trial. After the verdict was returned, defense counsel again moved for accelerated judgment on the ground that plaintiff had failed to prove that the discovery rule applied. The motion was taken under advisement and later denied on the basis of defendant's failure to raise the matter prior to the trial.

---

in sections 5805 or 5851 to 5856, or within 6 months after plaintiff discovers or should have discovered the existence of the claim, whichever is later. The burden of proving that the plaintiff, as a result of physical discomfort, appearance, condition or otherwise, neither discovered nor should have discovered the existence of the claim at least 6 months before the expiration of the period otherwise applicable to the claim shall be on the plaintiff. A malpractice action which is not commenced within the time prescribed by this subsection is barred.

[8] This allegation was contained in plaintiff's amended complaint.

In response to a posttrial motion by defendant, the court granted a remittitur of $250,000, which reduced the final judgment to $800,000.

Beaumont appealed and the plaintiff cross-appealed in the Court of Appeals. The Court of Appeals reversed the trial court's order of remittitur. It affirmed the trial court's ruling that prohibited cross-examination of Dr. Lawson regarding his settlement agreement with plaintiff. The Court also remanded the case to the trial court for determination of the statute of limitations issue on its merits.[9] Both parties sought relief in this Court. We granted leave to appeal and cross appeal.[10]

I

### THE STATUTE OF LIMITATIONS

The first question presented is whether the trial court erred in denying the defendant hospital's motion for accelerated judgment on the ground that plaintiff did not establish in his case in chief that his discovery of the defendant's malpractice occurred within the period of limitation provided in MCL 600.5838(2); MSA 27A.5838(2).

A

Plaintiff's amended complaint sets forth the allegation that "neither the plaintiff nor anyone acting on his behalf learned of or knew the exact nature of the relationship between the acts of the defendant and each of them and the condition and injuries suffered by the plaintiff until October of 1982." In response to this factual allegation by plaintiff, defendant asserted the legal conclusion

[9] *Palenkas v William Beaumont Hosp,* 162 Mich App 271, 284-285; 412 NW2d 709 (1987).

[10] *Palenkas v William Beaumont Hosp,* n 1 *supra.*

that "the claims set forth [in plaintiff's amended complaint] did not accrue within the applicable limitations period under MCL 600.5805 and 600.5838 before commencement of said action and is [sic] therefore barred by the Statute of Limitations." Defendant did not include any allegations of facts to support the asserted affirmative defense, nor did defendant file a pretrial motion for accelerated judgment on the basis of the operation of the statute of limitations. It was not until the close of plaintiff's presentation of his case in chief that defendant presented this motion for accelerated judgment.[11]

Defendant then proceeded with its case in chief. No evidence was presented with respect to the question of plaintiff's discovery of the defendant's alleged malpractice. When the case was sent to the jury, a special verdict form was used pursuant to GCR 1963, 514. The factual question regarding plaintiff's discovery of the defendant's malpractice was not among the items submitted to the jury for special verdicts.

B

Michigan court rules and case law have treated the operation of the statute of limitations as an affirmative defense. GCR 1963, 111.7;[12] *Moll v*

---

[11] The trial court did not rule on the motion for accelerated judgment at that time, stating: "I want to review some applicable case law. We're now moving on to the defense case."

[12] At the time of trial, civil practice in Michigan courts was governed by the General Court Rules of 1963. GCR 1963, 111.7 provided:

> Affirmative Defenses. A party shall in separate defenses set forth the facts constituting any affirmative defense, such as, contributory negligence, assumption of risk, payment, release, satisfaction, discharge, license, fraud, duress, estoppel, statute of frauds, statute of limitations, illegality, want or failure of consideration in whole or in part, that an instrument or

*Wayne Co,* 332 Mich 274; 50 NW2d 881 (1952); *In re McKeyes Estate,* 315 Mich 369; 24 NW2d 155 (1946); *Kengel v Palco,* 90 Mich App 338; 282 NW2d 312 (1979). GCR 1963, 111.7 required inclusion of all affirmative defenses in the parties' responsive pleadings under a separate and distinct heading along with facts to support the affirmative defense. *Thomas Industries, Inc v Wells,* 403 Mich 466, 469-470; 270 NW2d 98 (1978). In addition, GCR 1963, 116.1 required that a demand for accelerated judgment on the basis of the statute of limitations either be in a party's first responsive pleading or be filed at the same time as the first responsive pleading:

> .1 Grounds. In a party's first responsive pleading, or by motion filed not later than his first responsive pleading, a party may demand that service of process be quashed or that judgment be entered dismissing 1 or more claims asserted against him upon any of the following grounds:
>
> * * *
>
> (5) the claim is barred because of release, payment, prior judgment, *statute of limitations,* statute of frauds, infancy, or other disability of the moving party, or assignment or other disposition of the claim before commencement of the action. [Emphasis added.]

transaction is void or voidable in point of law, or cannot be recovered upon by reason of statute, or by reason of nondelivery, and any defense which by reason of other affirmative matter seeks to avoid the legal effect of or defeat the claim set forth in the plaintiff's complaint in whole or in part, and any ground of defense which, if not raised in the pleading, would be likely to take the adverse party by surprise. When a party has mistakenly designated a defense as a counterclaim or counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

In 1985 these rules were supplanted by the Michigan Court Rules of 1985. See MCR 2.111(F)(3)(a) for the current version of GCR 1963, 111.7.

Thus, Rule 116.1 was designed to promote judicial economy through early adjudication of dispositive issues. In *Robinson v Emmet Rd Comm,* 72 Mich App 623, 637-638; 251 NW2d 90 (1976), the Court stated:

A motion for accelerated judgment under [GCR 1963, 116.1] tests certain special defenses which may dispose of the case and should be heard preliminarily to determine whether a trial on the merits will be necessary, even though factual issues may have to be resolved in order to rule on the motion. A motion for accelerated judgment provides a method by which certain disputed issues can be adjudicated at an early stage with a possibility of ending the case and avoiding an expensive trial. [Accord 1 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 336.]

The party asserting an affirmative defense had the burden of introducing evidence to support the affirmative defense. *Thomas Industries, supra; Pollack v Oak Office Bldg,* 7 Mich App 173, 186; 151 NW2d 353 (1967). A party could not adequately raise the defense through mere assertion of bare legal conclusions. GCR 1963, 116.3 required a party to submit a supporting affidavit or other evidence where the grounds for the motion were not apparent from the pleadings:

.3 Affidavit Hearing; Immediate Trial. Any defense or objection raised under this rule, whether in a responsive pleading or by motion, may be noticed for hearing by either party as if raised by motion. Affidavits or other evidence may be submitted by either party to support or oppose the grounds asserted in the pleading or motion, *and in every case where the grounds asserted do not appear on the face of the pleading attacked, the demand shall be supported by affidavits or other evidence filed with the pleading or motion. . . .* As

to defenses and objections based upon sub-rule 116.1(5), the court may order immediate trial of any disputed questions of fact, and judgment may be rendered forthwith if the proof shows that the moving party is entitled to judgment on the facts as determined; or the court may postpone the hearing on the matter until the trial on the merits, and shall postpone the hearing if a jury trial has been demanded pursuant to right on or before the day of the hearing. [Emphasis added.]

In so providing, Rule 116.3 imposed a preliminary burden of production on the party raising the affirmative defense.

### C

Although Beaumont did not move for summary judgment or submit an affidavit containing facts in support of its affirmative defense, it argues that MCL 600.5838(2); MSA 27A.5838(2) placed the burden of proof on the plaintiff to show that he commenced the action on his claim within six months after he discovered or should have discovered the existence of the claim.

Section 5838(2), as it existed at the time of trial, provided in part:

(2) The burden of proving that the plaintiff, as a result of physical discomfort, appearance, condition or otherwise, neither discovered nor should have discovered the existence of the claim at least 6 months before the expiration of the period otherwise applicable to the claim shall be on the plaintiff. A malpractice action which is not commenced within the time prescribed by this subsection is barred.[13]

This section, by its terms, placed the "burden of

13 MCL 600.5838(2); MSA 27A.5838(2), prior to amendment by 1986 PA 178.

proof" regarding the discovery rule on the plaintiff.

In its strict sense the term "burden of proof" refers to the necessity or duty of affirmatively proving a fact or facts in dispute on an issue raised between the parties in a case. *McKinstry v Valley Obstetrics-Gynecology Clinic, PC,* 428 Mich 167, 178; 405 NW2d 88 (1987). Black's Law Dictionary (5th ed), p 178. A secondary use of the term, however, denotes the burden of going forward, i.e., the obligation to respond to a prima facie case established by the opposing party. *Kar v Hogan,* 399 Mich 529, 539-540; 251 NW2d 77 (1976). 29 Am Jur 2d, Evidence, § 123, pp 154-155. The burden of going forward with the evidence may shift at various times during the trial from one side to the other as evidence is introduced by the respective parties. 29 Am Jur 2d, Evidence, § 124, pp 155-156. *Ambrose v Wheatley,* 321 F Supp 1220, 1222 (D Del, 1971).

Only when evidence has been introduced tending to prove that the cause of action has been barred will the plaintiff have the burden of producing clear and decisive evidence to negate the bar. *Moll v Wayne Co, supra; Pollack v Oak Office Bldg, supra* at 186. 3 Callaghan's Michigan Pleading & Practice (2d ed), Limitation of Actions, § 36.168, p 632. Accordingly, it is consistent both for the defendant to have the initial burden of production on its affirmative defense and for the plaintiff to have the ultimate burden of convincing the jury that his claim is timely.

In this case, the defendant hospital, after neglecting to include factual allegations in its answer, continued to ignore its burden of production by failing to submit a pretrial motion for accelerated judgment or evidence in support thereof. Consequently, the plaintiff had no notice of any

factual allegations by defendant requiring nega-
tion in the plaintiff's case in chief. Thus, the
defendant's motion for accelerated judgment was
both untimely and without adequate factual sup-
port in the record.

Further, the defendant did not submit any evi-
dence on the statute of limitations issue in its case
in chief. The Court of Appeals found that defen-
dant was denied the opportunity to submit evi-
dence that plaintiff's claim was barred because
the trial court took defendant's motion for acceler-
ated judgment under advisement.[14] We disagree.
There is nothing in the trial court's statement
regarding the motion that could be interpreted to
preclude defendant from introducing evidence on
the statute of limitations issue.[15] Also, there is no
strategic reason why postponement of a decision
on this defendant's motion should force the defen-
dant to refrain from introducing facts in support
of its statute of limitations defense in its case in
chief.

To summarize, Beaumont failed to raise the
statute of limitations issue in a pretrial motion for
accelerated judgment, failed to allege facts in its
answer or to submit an affidavit or other evidence
prior to trial to rebut the plaintiff's allegation
regarding discovery of the defendant's malpractice,
and failed to present evidence on this issue in its
case in chief. Therefore, the defendant hospital
abandoned its affirmative defense of the expiration
of the statute of limitations and the trial judge
was correct in denying the motion for accelerated
judgment. Accordingly, it is unnecessary to re-
mand this cause to the trial court for resolution of
the related factual issues.

[14] 162 Mich App 284.
[15] See n 11.

II

On appeal, Beaumont asserts that the trial court erred when it allegedly changed its pretrial order in limine and when it refused to permit defendant hospital to impeach Dr. Lawson at trial with respect to his alleged interest, bias, and prejudice in favor of the plaintiff. Defendant asserts that Dr. Lawson's interest sprang from a settlement agreement reached with the plaintiff prior to trial that, inter alia, called for Dr. Lawson to pay $200,000 to the plaintiff and for the plaintiff to (a) indemnify Dr. Lawson for any further liability arising out of this episode, and (b) provide counsel to defend Dr. Lawson against the hospital's cross-claim.

At trial, Dr. Lawson was called to the stand by the attorney for the defendant hospital pursuant to MCL 600.2161; MSA 27A.2161, and was cross-examined as an adverse witness.[16] The defendant physician was asked no questions about his relationship to the plaintiff. After the defendant hospital rested its case, however, counsel for the hospital placed on the record a statement regarding the trial court's limitation of its cross-examination of Dr. Lawson.[17]

---

[16] Section 2161 provides:

In any suit or proceeding in any court in this state, either party, if he shall call as a witness in his behalf, the opposite party, employee or agent of said opposite party, or any person who at the time of the happening of the transaction out of which such suit or proceeding grew, was an employee or agent of the opposite party, shall have the right to cross-examine such witness the same as if he were called by the opposite party; and the answers of such witness shall not interfere with the right of such party to introduce evidence upon any issue involved in such suit or proceeding, and the party so calling and examining such witness shall not be bound to accept such answers as true.

[17] The following colloquy occurred:

The Court of Appeals below noted that the permissible scope of cross-examination on a collateral matter is left to the sound discretion of the trial judge.[18] Accordingly appellate review is limited to determining whether the trial court abused its discretion.

The Court of Appeals acknowledged that MRE 408 does not prohibit the use of settlement evidence to show bias.[19] The Court denied relief, however, primarily on the ground that there was no adequate record to permit review of this evidentiary issue:

The question whether there were implicit promises on the part of Lawson in his settlement with

*Mr. Feringa*: Your Honor, I apologize to the Court. During my cross examination of Doctor Lawson I was relying on the motion in limine which we had presented regarding the settlement, the conditions of the settlement and the fact that Mr. Palenkas now has agreed to pay for Doctor Lawson's attorneys fees as a result of the settlement and that Doctor Lawson irrespective of what this jury does would not be required to spend any more money.

The Court refused me the opportunity, the Court reversed herself, and refused me the opportunity to cross examine Doctor Lawson on that.

*The Court*: Just as you relied on that, I always rely on attorneys [sic] representations when I make a ruling and it was your representation that it would be a significant import to bring that evidence out because it would be necessary to attack the credibility of Doctor Lawson. As it turned out Doctor Lawson's testimony certainly was not designed to assist the Plaintiff, at least in this Court's mind and Mr. Fieger quite properly brought that to the Court's attention.

He has testified now very candidly somewhat expressing more candor than one sees on the witness stand and I didn't think that it would be appropriate at that point. The prejudicial affect [sic] was there and the Court of Appeals has rules and I was willing to go out on a limb because I felt it would be important with regard to the interest, bias, or prejudice the witness may have. He didn't demonstrate any so we were able to nip it in the bud because Mr. Fieger objected timely.

*Mr. Feringa*: Thank you, Your Honor.

[18] *Palenkas v William Beaumont Hosp,* n 9 *supra* at 288-289.
[19] *Id.* at 289.

plaintiff that necessarily give rise to an indication
of bias toward the hospital presents a closer, more
difficult issue. Insofar as in the case between plain-
tiff and defendant hospital, it made no difference
whether defendant hospital was guilty of separate,
independent negligence, any bias on the part of
Lawson was irrelevant. But, insofar as plaintiff
agreed in the settlement agreement to indemnify
Lawson for any recovery defendant hospital might
make against Lawson, Lawson's bias would appear
very relevant. However, in spite of that, since we
have a record that does not show exactly what
defendant hospital sought in its motion in limine,
does not show exactly how the trial judge origi-
nally ruled and, most importantly, does not show
the questions that defendant hospital intended to
put to Lawson, we decline to find that the trial
judge abused her discretion in denying defendant
hospital's belated effort to examine Dr. Lawson
regarding his settlement with plaintiff.[20]

We agree with the Court of Appeals that the
sparsity of the trial court record precludes appel-
late review of the nature and treatment of Beau-
mont's motion in limine regarding impeachment of
the defendant Dr. Lawson. We also agree that
Beaumont's failure to make a more detailed offer
of proof precludes this Court from making a full
analysis of the potential import of Dr. Lawson's
testimony. Moreover, on the basis of the trial
court's analysis of Dr. Lawson's testimony wherein
she stated that "[h]e has testified now very can-
didly somewhat expressing more candor than one
sees on the witness stand," we find that, given Dr.
Lawson's lack of financial interest in the ultimate
outcome of the jury's verdict regarding the defen-
dant hospital, his testimony was sufficiently relia-
ble. Therefore, we find no clear error in the Court
of Appeals holding that the trial judge did not

[20] *Id.* at 290.

abuse her discretion in denying defendant hospital the opportunity to cross-examine Dr. Lawson regarding his settlement with plaintiff.

### III

#### REMITTITUR

#### A

Finally, defendant argues that the Court of Appeals erred in reversing the trial court's remittitur order and reinstating the jury verdict. It is well established in Michigan law that appellate review of a grant or denial of remittitur is limited to the determination of whether an abuse of discretion occurred. *Majewski v Nowicki,* 364 Mich 698, 700; 111 NW2d 887 (1961); *Stevens v Edward C Levy Co,* 376 Mich 1, 6; 135 NW2d 414 (1965). Generally an appellate court will determine whether there has been an abuse of discretion by applying one of the following tests:

1. Was the verdict excessive or did it fall within the scope of the testimony, i.e., was it supported by the proofs?
2. Was the verdict the result of prejudice, passion, partiality, sympathy or corruption?
3. Does the size of the verdict shock the judicial conscience?

9 Michigan Law & Practice (2d ed), Damages, § 121, pp 113-114. *Stevens v Edward C Levy Co, supra* at 5; *Majewski v Nowicki, supra; Pippen v Denison Div of Abex Corp,* 66 Mich App 664; 239 NW2d 704 (1976).

A court should be reluctant to disturb a jury verdict for personal injuries upon the ground that

the amount is excessive. *McKay v Hargis,* 351
Mich 409, 419; 88 NW2d 456 (1958); *Gibbons v
Delta Contracting Co,* 301 Mich 638, 653; 4 NW2d
39 (1942).

In evaluating a jury verdict for possible remittitur, a court should review the verdict in the light
most favorable to the plaintiff. *Stowers v Wolodzko,* 386 Mich 119, 142; 191 NW2d 355 (1971). In
*Precopio v Detroit,* 415 Mich 457, 464-465; 330
NW2d 802 (1982), this Court stated:

> [D]ecisions of this Court state that awards for
> personal injury should rest within the sound judgment of the trier of fact, particularly awards for
> pain and suffering, and recognize that there is no
> absolute standard by which to measure such
> awards. Such deference in part reflects recognition
> that the trier of fact observes live testimony, while
> an appellate court reviews a printed record. In a
> case tried to a jury, such deference may further
> reflect a reliance on the communal judgment of
> the members of the jury in awarding monetary
> compensation for such imponderables as pain and
> suffering.

When a jury verdict is based in part upon pain
and suffering, a trial court must balance all of the
factors involved against the general principle that
there is no absolute mathematical formula or standard by which pain and suffering can be measured;
thus, the amount allowed for pain and suffering
must ordinarily rest in the sound judgment of the
jury. *Stevens v Edward C Levy Co, supra* at 5;
*Weeks v Hyatt,* 346 Mich 479, 490; 78 NW2d 260
(1956).[21]

---

[21] In *Cleven v Griffin,* 298 Mich 139, 141; 298 NW 482 (1941), this
Court stated:

> There is no absolute standard by which we can measure the
> amount of damages in personal injury cases. The amount

B

In the instant case, the plaintiff introduced substantial testimony regarding the immense pain and suffering experienced by the plaintiff during his initial treatment by Dr. Lawson and his subsequent treatment by Drs. Osborn and Mayer,[22] as well as the continuing pain and suffering the

allowed for pain and suffering must rest in the sound judgment of the triers of the facts. *Watrous v Conor,* 266 Mich 397 [254 NW 143 (1934)]; *Weil v Longyear,* 263 Mich 22 [248 NW 536 (1933)]. Courts are reluctant to disturb verdicts of juries for personal injuries on the ground that the amount is excessive. *Cawood v Earl Paige & Co,* 239 Mich 485 [214 NW 402 (1927)]. We do not usually substitute our judgment for that of the jury unless the verdict shocks the conscience or has been secured by improper means, prejudice or sympathy. *Watrous v Conor, supra; Michaels v Smith,* 240 Mich 671 [216 NW 413 (1927)]. The verdict was within the range of the testimony and not excessive.

Similarly, in *Fishleigh v Detroit United Ry,* 205 Mich 145, 167; 171 NW 549 (1919), the Court stated:

[T]here is no market place where pain is bought and sold. Compensation for suffering must primarily be fixed by the jury with an honest judgment based on the evidence as their guide.

[22] On direct examination, Dr. Mayer gave the following testimony:

*Q.* You testified earlier that under normal circumstances such a procedure such as the one you performed would normally take two to three months.

Do you have an opinion as to why the procedures you performed on Mr. Palenkas took such—it was approximately four years?

*A.* The amount of time that was necessary to go through the three phases were due as a result of correcting the position of the patient's mandible from the time I saw him.

*Q.* Do you have an opinion as to the relative pain and discomfort that was associated with the procedures that were undertaken by you?

*A.* Yes. I think the amount of pain that the patient experienced from the surgeries were a major part of the reason why I did not choose to totally complete the phases that were initially outlined that I was going to do. Every tooth that we worked on had to receive root canal therapy because of the amount of sensitivity that Brian experienced from just normal dental procedures.

plaintiff will experience throughout his life, includ-
ing the humiliation he will endure as a conse-
quence of his asymmetrical face, all of which
resulted from the irreparable damage caused by
the defendant's malpractice.[23]

> At the point of completing the phases that I did on 3-9-82, I
> chose not to go any further because I did not feel that the
> patient was able to tolerate any more dental treatment at that
> point due to the amount of pain and suffering that he had
> undergone during the last three and a half-four years.
>
> Q. Do you envision any future treatment for Brian?
> A. Yes, I do.
> Q. Could you describe that?
>
> * * *
>
> A. I think there is evidence that there has been undue wear
> in his masticatory apparatus, some of which I had to accelerate
> by doing equilibration of his mouth. In order to get his teeth to
> function and in order to get Brian into as stable a position
> prosthetically as we can, I feel that the upper posterior teeth as
> well as the lower left teeth will have to undergo reconstructive
> therapy.

[23] This is plaintiff's testimony on direct examination when asked
how he felt at the time of trial:

> Q. Would you describe to the jury how your mouth feels?
> A. It feels the same. It hurts all the time. The weather—
> anything brings it on. The teeth still don't meet the way they
> should and they are sensitive whenever I get anything done. If
> I go for a simple filling or something, I usually have to get a
> root canal or something like that. They are just too sensitive to
> do anything on.
> Q. Can you eat anything you want?
> A. No. I just have to stay—well—I can try to eat anything I
> want but I just have to stay to soft foods.
> Q. Can you exercise?
> A. Very limited amount. I just can't—whatever puts pressure
> on my jaw or if I clinch my teeth or jarring or anything like
> that I can't do it.
> Q. How did it feel about having to be operated on so many
> times?
> A. Not too good at all. I didn't want to go through any more
> operations after Dr. Lawson wired my jaw the first time. I
> couldn't consider doing any more.
> Q. Have you been told whether there is anything further
> that can be done to your jaw?
> A. As far as I know there is nothing a surgeon can do.
> Q. How does your hip feel today?

Although the plaintiff admitted on cross-examination that he had dated and engaged in sports,[24] the defendant did not introduce any testimony to directly rebut plaintiff's evidence regarding his injuries, pain, and suffering.

In response, however, to a defense motion for new trial or in the alternative remittitur, the trial court reduced the jury verdict by $250,000.[25]

*A.* Well, it's still sore whenever I put pressure on it or the weather, anything brings it on.

*Q.* What is your understanding of what's going to be the future progress of your hip?

*A.* It is just going to get worse the older I get.

*Q.* How about your physical appearance. Can you tell us about any changes in your physical appearance?

*A.* The symmetry on my face still isn't the same. It's not— my chin is still over to the side. It's flat and one side isn't the same as the other.

*Q.* Do you go out socially now, on dates or anything like that?

*A.* Yes.

*Q.* In terms of the pain that you described, does it affect your ability to work or your concentration in school?

*A.* Yes. It's hard to concentrate or do anything.

*Q.* Why?

*A.* Just because it detracts from anything I do. You can't focus all of your concentration on one thing when your jaw is sore.

[24] *Q.* You are currently not under any restrictions from any doctor as to your physical activities, is that correct?

*A.* Correct.

*Q.* The restrictions that you have, the things that you do are self imposed because of pain, is that right?

*A.* Right. They told me to do whatever I could.

*Q.* Sir, in 1980, did you play softball on a church league?

*A.* Yes.

*Q.* And did you play as an outfielder?

*A.* I think so.

[25] The trial judge stated:

Lastly, the Court, in reviewing this matter reviewed its notes and does not take this matter lightly.

I have indicated that, because Kenneth Gibcan, communicated to counsel some of which has apparently come back in

Although the court expressly disavows substitution of its judgment for that of the trier of fact, it is clear that that is what occurred in this case. For example, the court stated:

the form of briefs and pleadings. It's not a matter of substituting my judgment. The Court has never done that before, but in this situation, the Court could only, upon what it saw and heard in the court, cannot say an award in this Court's opinion was within the range of evidence.

It did shock the judicial conscious [sic]. The Court believes that this jury was inflamed and was angry. Perhaps it was because the hospital really offered no other witnesses other than the attending doctor. The doctor was not on trial, but the jury was angry.

The jury, I believe in my opinion, listening to that doctor found him arrogant and conceited and listening to him was inflaming the jury.

Beyond that, the Court heard the evidence. The Court finds that plaintiff's counsel has accurately quoted much of the evidence. The Court found that the plaintiff did suffer severe, acute pains at the time he had the surgeries. Some of the surgeries which, obviously, had to be performed to begin with based on other matters totally unrelated to the hospital or hospital doctor.

The Court finds that he did satisfy the jury as to the point that he suffered then. But as to plaintiff's claim that he has suffered a severe disfigurement and disability, this Court observed that young man and he's not the kind of young man who has his face all scarred up or anything.

As a matter of fact, he is a good-looking young man. He's got a slight flattening of the jaw on one side at the most, but we are not dealing with a situation where he burned his face or somebody that if anyone looked at, would grimace.

I heard him testify. He talked fine. He was functioning fully. He attends school. He workds. [sic] He has a very full day. This is not [a] situation of a disabled individual that can no longer function in society. He functions completely and is not the kind of person that anyone would turn their heads and might say, what happened to him. He would just blend right in with any crowd.

With regards to continuing pain, the doctors described that what he is suffering right now is a chronic type of discomfort that goes along with malocclusions. It's a nuisance problem is what they testified to.

With these considerations in mind, with what the Court heard and so forth, and with the consideration that by reducing the award to 8 hundred thousand, he still has a very nice income for the rest of his life.

The Court feels that the remittur [sic] is appropriate and I will remit into [sic] the sum of $800,000.

[T]his Court observed that young man and he's
not the kind of young man who has his face all
scarred up or anything.

As a matter of fact, he is a good-looking young
man. He's got a slight flattening of the jaw on one
side at the most, but we are not dealing with a
situation where he burned his face or somebody
that if anyone looked at, would grimace.

This is obviously the court's rejection of the jury's
evaluation of plaintiff's testimony regarding his
feelings of self-consciousness, as well as the expert
testimony regarding the extent of the irreparable
damage to his face. With respect to plaintiff's pain
and suffering, the trial court apparently ignores
the substantial evidence presented regarding the
excruciating pain endured during the course of the
multiple surgical procedures on plaintiff's jaw, as
well as the chronic pain that plaintiff will suffer
for the rest of his life.

Because the trial judge clearly substituted her
judgment for that of the jury in evaluating the
plaintiff's damages, the Court of Appeals was
correct when it reversed the trial court's order of
remittitur.

This Court does not intend to assert that the
amount of the judgment reached by the trial court
is unreasonable, nor does this Court aver that the
result reached by the jury is that which would
have been reached by the Court in its own deliber-
ation. In fact, we have examined awards in many
similar cases where plaintiffs incurred serious
head or facial injuries,[26] and we would probably
have arrived at a figure that is different from the

[26] The following cases represent appellate review of jury awards in
cases where the plaintiffs suffered head or facial injuries.

*Phillips v Schoenberger,* 369 Pa Super 52; 534 A2d 1075 (1987). The plaintiff suffered multiple facial lacerations, a fractured nose, a torn lip and nostril and a muscular ligamentous injury of the spine. He spent several days in the hospital and underwent several surgical procedures to minimize scarring of his face. Because the surgery was not entirely successful, the plaintiff has permanent scars and continues to suffer chronic pain in his back, muscle spasms, and chronic headaches due to muscular contraction pain. The jury award of $100,000 was held not to require remittitur or a new trial.

*Coulter v Michelin Tire Corp,* 622 SW2d 421 (Mo App, 1981). The plaintiff suffered multiple fractures of the left arm and fracture of the left zygoma or cheekbone. The plaintiff suffered a concussion and plaintiff underwent multiple surgical procedures to repair the fractures to the arm and cheekbone. The jury verdict of $140,000 was held not to be excessive, not requiring remittitur.

*Armellini Express Lines of Florida v Ansley,* 605 SW2d 297 (Tex Civ App, 1980). Substantial disfigurement of the face and body due to an automobile accident, causing considerable pain and suffering including chronic pain for the rest of the plaintiff's life. The jury award of $624,000 was held not to be excessive so as to require a remittitur.

*Allied Industrial Int'l, Inc v Placencio,* 685 SW2d 364 (Tex App, 1984). The plaintiff was injured when struck in the face and head by parts from an exploding bench grinder, resulting in impaired vision in the right eye, frontal sinuses fractured and crushed, nasal bones crushed and flattened resulting in some loss of smell and taste. Unable to return to work on a permanent basis. The amount awarded was $564,495.

*Aubert v Aubert,* 129 NH 422; 529 A2d 909 (1987). A man was injured when his wife shot him in the face from a distance of less than two feet with a .38 caliber hollow point bullet. The left side of his cheek, lip and nose were blown out and his teeth and bone were shattered. Despite extensive reconstructive surgery some damage remains permanent. The amount awarded was $343,000.

*Detroit Marine Engineering v McRee,* 510 So 2d 462 (Miss, 1987). A man was injured when he was thrown from a boat in which he was riding. He sustained lacerations above the right eye, depressed fractures of the right side of the forehead, fractured right cheekbone, fractured right orbit, fractured nasal bone, requiring extensive surgery. He was out of work for thirteen months. He suffers from permanent undefinable mild blunting of judgment and is likely to experience euphoric feelings from time to time and suffers from double vision when looking to the extreme right or left. He is permanently disfigured and likely to suffer permanent residual effects. The amount awarded was $1,000,000.

*Broom v Southeastern Hwy Contracting Co,* 291 SC 93; 352 SE2d 302 (1986). The plaintiff suffered fractures of the right orbit and cheekbone, collapsed lung, dislocated shoulder, fractured liver, fractured ribs, and internal bleeding, requiring surgery and hospitalization. The orbital fracture necessitated plastic implant. The plaintiff suffered from double vision, watering and swelling of the right eye, noticeable depression of the right cheek, pain in the abdomen, ribs, and lower back when lifting or bending, resulting in five percent

permanent impairment of the spine and left arm. The amount awarded was $500,000.

*Gasquet v Commercial Union Ins Co,* 391 So 2d 466 (La, 1980). The plaintiff was injured when his airboat struck a sand bar and he sustained a concussion and numerous severe facial fractures and lacerations. He required a series of operations to repair the fractures. He experienced loss of the sense of smell. Future surgery is recommended to reduce scar tissue, realign facial features, and to repair teeth. Damages fixed by the court were $588,925.

*Hardeman v Mendon Leasing Corp,* 58 NY2d 892; 460 NYS2d 499; 447 NE2d 47 (1983). A man injured in an automobile accident suffered an emergency tracheotomy and thoracostomy. Injuries included a concussion, skull contusion, fractured rib, multiple nose and facial fractures, resulting in a hospital stay of two weeks, no further treatment required. The jury verdict of $425,000 was reduced to $275,000 by remittitur.

*Brennan v New York City,* 108 AD2d 834; 485 NYS2d 339 (1985). The plaintiff received extensive comminuted fracture of the right femur, fracture of the nasal bone, cerebral concussion and facial lacerations rendering her unable to return to work. The award of $500,000 was not deemed excessive.

*Sweatt v Norman,* 283 SC 443; 322 SE2d 478 (1984). The plaintiff suffered fracture to her right knee cap and right thigh bone, fifty percent residual loss of function of the right leg, posttraumatic arthritis, multiple head and facial injuries, numerous extensive lacerations, nasal fracture, cheekbone fractures and fractures of her lower jaw and mandible. The jury verdict of $1,500,000 was held not to be excessive.

*Rowan v Nassau Co,* 91 AD2d 608; 456 NYS2d 418 (1982). The plaintiff suffered a severe fracture of the left arm, fracture of the left leg, bilateral skull fracture and brain damage, loss of four teeth, fractured jaw, broken nose and scars in various places on her face. The award of damages of $800,000 was not excessive.

*Gulf Life Ins Co v McCabe,* 363 So 2d 846 (Fla App, 1978). The plaintiff sustained complete fracture of her cheekbone, two fractures of her lower cheekbone, two fractures of lower jaw and injuries to her eyes and teeth, causing severe pain. The plaintiff would need constant adjustment of teeth due to deviation in her mouth. The jury award of $150,000 was deemed not excessive.

*Brown v Penrod Drilling Co,* 534 F Supp 696 (WD La, 1982). The plaintiff suffered injuries, including facial hemorrhages, two skull fractures, paralysis of the left side of his face, loss of hearing in his left ear and right shoulder separation. The award of $502,000 was deemed not excessive.

*Tomei v Bloom Associates, Inc,* 75 Mich App 661; 255 NW2d 727 (1977). The plaintiff experienced numbness in the area of the lower lip. No disfiguring injury, no loss of use of any part of her body, nor loss of ability to be gainfully employed or to maintain home and care for her children, was reduced. The plaintiff had suffered no pain other than some hypersensitivity to cold weather. The award of $260,000 and $15,000 to her husband was excessive; damages reduced to $100,000 for plaintiff and $10,000 for her husband.

jury verdict, just as the trial court did. The question presented did not, however, allow this Court to substitute its judgment for that of the trier of fact below. The cited cases, while similar, could never present the same facts and evidence as that heard by the trier of fact below. They provide insufficient justification for this Court to superimpose its will in derogation of the principle of trial by jury on the basis of the cold record here reproduced.[27]

In ordering remittitur, the trial court indicated that the jury was inflamed by Dr. Lawson's testimony. The trial court points to no specific statements by Dr. Lawson or misconduct by trial counsel during his testimony that would engender the type of passion or bias necessary to interfere with a jury verdict. Nor does our review of his testimony reveal any source of undue prejudice.

The Court in *Stevens v Edward C Levy Co,*

See also anno: *Excessiveness or adequacy of damages awarded for injuries to head or brain or for mental or nervous disorders,* 14 ALR4th 328, 328-533.

[27] The opinion of Chief Justice RILEY with respect to the question of remittitur leaves no doubt that this issue is close. The cogent arguments presented in part II therein, when juxtaposed with those in part III B of this opinion, serve to illustrate the difficulty of arriving at a consensus on the amount of money damages in a personal injury suit. It is precisely this difficulty that, in the instant case, justifies deference to the collective wisdom of members of the jury below, despite the fact that reasonable persons might properly conclude that $800,000 is the maximum verdict supported by the evidence adduced at trial.

In fact, the remittitur of $250,000 represented a reduction of only twenty percent from the original verdict of $1,250,000. Such a reduction could be perfectly reasonable in the abstract, particularly when viewed in the light of a trial judge's wisdom, experience and ability to observe the presentation of evidence. In the case *sub judice,* however, defendant presented no substantive evidence to convince the jury that plaintiff's injuries were less severe than asserted. The jury verdict was within the range sustainable on the basis of the evidence.

Although I find the arguments of the Chief Justice persuasive, I am constrained to conclude that the principles embodied in the tradition of trial by jury militate in favor of reversing the trial court's order of remittitur.

*supra* at 4, was presented a situation where it was claimed that the jury verdict resulted from passion or prejudice. The Court stated:

> There [being] no showing of any improper conduct or language by plaintiff or her counsel, as thought by the trial judge, which would have inflamed the jury or appealed improperly to its sympathy or caused a verdict resulting from passion, prejudice, partiality, or corruption, the verdict should be upheld unless it is so excessive as to shock the judicial conscience.

In the case at bar, the jury verdict was reasonable, given the poignant factual evidence presented by plaintiff. In reversing the trial court's remittitur, the Court of Appeals stated:

> Plaintiff testified that he experiences chronic pain that is worsened by the weather and that has not been alleviated by exercise. He claims difficulty in chewing hard foods and in speaking. The oral surgeon testified that plaintiff has a permanent disability in the form of joint disease in his jaw and that accompanies this condition. He will also have some disability with his hip as a result of the bone graft. Further, since one of the surgical procedures required manipulation of two nerves in the jaw bone, plaintiff has a permanent numbness in the lower jaw. Aside from the dental restoration plaintiff has already gone through, there was testimony that plaintiff will have to undergo further reconstructive treatment in the future at a cost of approximately $10,000 to $20,000. In addition, plaintiff's continuing functional disability with respect to the vertical components in his jaw may necessitate further reconstructive surgery. Aside from the physical and functional disability, the jury heard plaintiff's testimony and that of his mother and a psychologist who examined him indicating that he was experienced, and will continue to experience, severe pain and suffer-

ing as a result of the malpractice. For these rea-
sons, we believe the jury verdict was within the
range of the evidence and was not so excessive as
to shock the judicial conscience. On the contrary,
the damages awarded related more to plaintiff's
injuries than to anger at Dr. Lawson. Conse-
quently, we would be very reluctant to disturb this
verdict merely because of its size and, therefore,
regarding this issue, we reverse the order of remit-
titur and reinstate the jury verdict. [162 Mich App
271, 292-293; 412 NW2d 709 (1987).]

We agree with the Court of Appeals analysis. The
plaintiff's evidence substantially supported the
jury verdict, thereby rendering trial court's order
of remittitur an abuse of discretion.

### CONCLUSION

We find that defendant hospital both waived and
abandoned its affirmative defense of the operation
of the statute of limitations when it failed to file a
pretrial motion for accelerated judgment, failed to
notice such a motion for hearing prior to trial,
never introduced any evidence to rebut plaintiff's
initial allegation in its complaint that plaintiff
neither discovered nor should have discovered the
relationship between the malpractice of defendant
and the injuries suffered by plaintiff more than six
months prior to the commencement of the action,
and failed to request a special verdict on the
applicability of the discovery rule.

We conclude that there was not a sufficient
record created below to allow this Court to find an
abuse of discretion on the part of the trial court in
refusing to allow defendant hospital to cross-exam-
ine the defendant, Dr. Lawson, with respect to the
pretrial settlement negotiated between plaintiff
and Dr. Lawson.

Finally, the Court of Appeals was correct in finding that the trial court abused its discretion in granting remittitur. The evidence submitted by plaintiff with respect to his injuries, pain, and suffering was largely unrebutted by defendant hospital and was sufficient to support the jury's verdict.

Therefore, the judgment of the Court of Appeals should be affirmed in part and reversed in part.