## MILLER v OCHAMPAUGH

Docket No. 121516. Submitted December 11, 1990, at Grand Rapids.
Decided April 25, 1991; approved for publication August 29,
1991, at 9:10 A.M.

Timothy D. Miller brought an action in the Wexford Circuit
Court against William V. and Ivan Ochampaugh and Lewis
Feister, seeking damages for injuries sustained in a motorcycle
accident caused by William Ochampaugh after he was served
alcohol in Feister's bar. The court, William R. Peterson, J.,
granted Miller's pretrial motion for summary disposition
against the Ochampaughs with regard to the issue of liability,
finding no genuine issue of material fact. The matter proceeded
to trial of the issues of Feister's liability and the amount of
damages with regard to all of the defendants. The court en-
tered a judgment on the jury's verdict, awarding damages to
the plaintiff against the Ochampaughs, but finding in favor of
Feister with regard to the dramshop action. The plaintiff ap-
pealed.

The Court of Appeals *held:*

1. The court erred in instructing the jury that a subjective
standard applied, under which William Ochampaugh had to
appear visibly intoxicated to an employee of the bar before
liability could be imposed upon the dramshop defendant. In-
stead, the dramshop act applies an objective standard, under
which it was only necessary for the jury to determine that
William appeared visibly intoxicated to an ordinary observer
and that William was served alcohol by the dramshop defen-
dant while visibly intoxicated. The error was not harmless.

2. The jury's finding that the dramshop defendant did not
furnish alcohol to William at a time when he was visibly
intoxicated was against the great weight of the evidence. The
court abused its discretion in denying the plaintiff's motion for
a new trial against the dramshop defendant.

3. There is no basis for a determination whether the court

REFERENCES

Am Jur 2d, Damages §§ 566, 567, 675, 1029-1031; Intoxicating
Liquors §§ 564, 566, 578, 587.

Validity, construction, and effect of statute limiting amount recov-
erable in dram shop action. 78 ALR4th 542.

abused its discretion in denying the plaintiff additur with regard to the jury's award for future noneconomic damages.

4. The court did not abuse its discretion in restricting the testimony of the plaintiff's expert toxicologist with regard to William Ochampaugh's likely blood alcohol content while at the defendant tavern.

5. The tort reform statute, MCL 600.6301 *et seq.*; MSA 27A.6301 *et seq.*, applies to dramshop actions brought under MCL 436.22; MSA 18.993, except to the extent that the dramshop act provides otherwise. The dramshop act does not contradict the Revised Judicature Act in any way applicable to this case.

6. The court's application of those portions of the tort reform statute to which the plaintiff objected did not work to the plaintiff's detriment; therefore, the plaintiff's argument that those provisions are not applicable to automobile negligence actions was not considered.

Affirmed in part, reversed in part, and remanded.

1. INTOXICATING LIQUORS — DRAMSHOP ACT — VISIBLE INTOXICATION — OBJECTIVE STANDARD.

The dramshop act creates an objective standard for determining whether a person was visibly intoxicated when served alcohol; under the standard, it is not necessary for the jury to determine that the allegedly intoxicated person appeared visibly intoxicated to an employee of the dramshop; rather, it is only necessary for the jury to determine that the allegedly intoxicated person appeared visibly intoxicated to an ordinary observer and was served alcohol by an employee of the dramshop while visibly intoxicated (MCL 436.22; MSA 18.993).

2. JUDGMENTS — ADDITUR.

The "shock the conscience" test does not apply in reviewing a jury award; rather, objective criteria must be applied relating to the actual conduct of the trial or the evidence adduced to determine if an adjustment should be made to the jury award; the court's decision may not be disturbed on appeal absent an abuse of discretion.

3. INTOXICATING LIQUORS — DRAMSHOP ACT — REVISED JUDICATURE ACT — TORT REFORM STATUTE.

A dramshop action falls within the provisions of the Revised Judicature Act, including chapter 63 of the RJA, the tort reform statute, except where the dramshop act has a specific provision that contradicts the provisions of the RJA (MCL 436.22[12], 600.101 *et seq.*, 600.6301 *et seq.*; MSA 18.993[12], 27A.101 *et seq.*, 27A.6301 *et seq.*).

*Donn Hubbell, P.C.* (by *Donn Hubbell*), for the plaintiff.

*Benson, McCurdy & Wotila, P.C.* (by *Roger Wotila*), for Lewis Feister.

Before: MAHER, P.J., and SAWYER and BRENNAN, JJ.

PER CURIAM. Plaintiff appeals from a judgment entered upon a jury verdict that awarded damages to plaintiff with regard to his complaint against defendants Ochampaugh, but that found in favor of the dramshop defendant. We reverse.

This action arose out of events that occurred on the night of June 4, 1987, and the early morning hours of June 5, 1987. At approximately 10:30 P.M. on June 4, plaintiff left his home east of Cadillac, Michigan, and drove his motorcycle into Cadillac. He proceeded to the defendant tavern, the Roaring Twenties Saloon, arriving between 10:45 P.M. and 11:00 P.M.

William Ochampaugh was also at the defendant tavern, having arrived between 8:00 P.M. and 8:30 P.M. Before arriving at the bar, he had purchased two fifths of whiskey and had driven around awhile, consuming approximately one-quarter of one of the bottles of whiskey. While at the defendant tavern, Ochampaugh purchased several more drinks. The details of his drinking at the bar will be described more fully below.

Plaintiff stayed at the defendant tavern for thirty to forty-five minutes and then drove to another tavern, where he played pool for 1½ to 2 hours. While there, he met a friend, Denise Gable. Plaintiff and Gable left the bar at approximately 2:00 A.M. When they left, plaintiff drove his motorcycle and followed Gable, who was driving a pickup truck.

Meanwhile, William Ochampaugh had left the defendant tavern driving a car owned by his father, Ivan Ochampaugh. As Gable and plaintiff proceeded down the road, William Ochampaugh approached from the opposite direction. According to Gable, Ochampaugh's car was weaving all over the road. The Ochampaugh vehicle crossed the center line, striking Gable's truck and causing it to veer into a ditch. Plaintiff's motorcycle ran into the back of the truck. Plaintiff sustained injuries to the left side of his body, with particularly severe injuries to his left knee and leg.

Because the issue of the liability of William and Ivan Ochampaugh was determined before trial when the court granted plaintiff's pretrial motion for summary disposition with regard to that issue, the only issues at trial were the liability of the defendant tavern and the amount of damages with regard to all of the defendants. Plaintiff sought to prove that William Ochampaugh was visibly intoxicated when served drinks at the defendant tavern, and the defendant tavern sought to show the contrary.

There were two people, a bartender and a waitress, working at the defendant tavern on the night of the accident. The bartender, Raymond Johnson, began working at 7:00 P.M. He was the only employee there until 9:00 P.M., when Kim Kososky, the waitress, came on duty.

Clifford Wilkinson testified that he arrived at the defendant tavern at 9:00 P.M. or 9:30 P.M. and that plaintiff arrived sometime thereafter. After plaintiff arrived, Wilkinson sat next to him at the bar and talked to him for five or ten minutes. During that period, William Ochampaugh came over and also began talking to plaintiff. According to Wilkinson, Ochampaugh was extremely intoxicated at the time. Wilkinson testified that Ocham-

paugh's eyes were half-closed, his speech was slurred, and he was stumbling. Wilkinson further testified that Ochampaugh ordered two drinks and drank one while standing at the bar. Wilkinson said he also saw Ochampaugh in the bar later that night and that he was stumbling, weaving, and wobbling. Wilkinson also said that Ochampaugh ordered several rounds of drinks for those at the table at which he was sitting. Wilkinson further testified that there was no doubt in his mind that Ochampaugh was extremely intoxicated and that Ochampaugh's intoxication was plainly visible to him.

The next witness, Merry Miller, testified by deposition. She testified that when Ochampaugh arrived between 8:30 P.M. and 9:00 P.M., he came right over to the table where she, her brother, and some friends were sitting. Merry Miller further testified that she could tell Ochampaugh had been drinking when he first got there, and that Ochampaugh told her that he had been drinking since ten o'clock that morning. She also said that Ochampaugh stayed at her table for about an hour, then walked around the bar. She said that after Ochampaugh left the table and began walking around, he always had a drink and, sometimes, had one in each hand. She also saw him go up to the bar and order drinks a few times after he left the table. According to Merry Miller, Ochampaugh bought five or six rounds of drinks for her table during the 1½- to 2-hour period after he arrived and that those drinks were brought by the waitress. Ochampaugh was drinking Crown Royal whiskey mixed with Squirt.

Merry Miller further testified that Ochampaugh became "physically intoxicated" after drinking the five or six drinks that were delivered to the table. Ochampaugh was slurring his words and weaving

a little bit when he walked. She testified that Ochampaugh was exhibiting those signs of intoxication about 10:00 P.M. or so, and also that Ochampaugh was continually served drinks after 10:00 P.M. According to Merry Miller, Ochampaugh was visibly intoxicated after 10:00 P.M. She also testified that, at one point in the evening, Ochampaugh told her he had two fifths of whiskey out in his car and asked if she wanted to go out and help him drink them. She did not accept the offer, but her brother-in-law Kevin Richardson did. She was not sure how long Ochampaugh and her brother-in-law stayed outside before coming back into the bar.

Kevin Richardson testified that he made one trip with Ochampaugh out to the car to drink whiskey but that he did not know what time that occurred. According to Richardson, Ochampaugh was very drunk when they went out to the car. Ochampaugh dropped his car keys and was unable to get them into the key slot. Also, his speech was slurred. Richardson also testified that Ochampaugh exhibited signs of intoxication before they went out to the car. Richardson said that he saw Ochampaugh buy at least one round of drinks for the table and that that round was served by the waitress. According to Richardson, when the round was served, Ochampaugh was slurring his words. That occurred before Richardson and Ochampaugh went out to the car. Richardson further testified that there was no doubt in his mind that by 10:00 P.M. Ochampaugh was extremely intoxicated and that it was plain to see because Ochampaugh's speech was slurred, he was loud and boisterous, and he staggered and weaved when he walked.

Jeanne Langmesser, who lives with Ochampaugh's girl friend, Peggy Winkleman, testified that she and Winkleman arrived at the defendant tavern around 11:30 P.M. on the night of the

accident. About fifteen minutes later, Ochampaugh
came and sat at their table. According to Lang-
messer, Ochampaugh was extremely intoxicated at
that time. She testified that he had trouble with
balance, was slurring his words, and his eyes were
half-closed. Langmesser told Ochampaugh he was
drunk, and he agreed. She further testified that
Ochampaugh ordered drinks while at her table. He
received one at the table from the waitress, and
got two others from the bar himself. Langmesser
also testified that, at one point, Ochampaugh
asked her to go out to the car and offered her some
whiskey, but she declined. He then offered her
some cocaine, and she rejected that offer as well.
Langmesser testified that she was not certain, but
thought she and Winkleman left the bar between
12:30 A.M. and 1:00 A.M. Winkleman drove home
and Ochampaugh followed in his car. Langmesser
stayed home, and Winkleman left with Ocham-
paugh.

Plaintiff testified that he arrived at the defen-
dant tavern between 10:45 P.M. and 11:00 P.M. He
sat at the bar and ordered a hamburger and a
mixed drink. About five minutes later, Ocham-
paugh came up and asked him if he wanted to go
out to the car and drink some whiskey. Plaintiff
declined, and Ochampaugh then asked plaintiff if
he would like a drink. When plaintiff said he
would if Ochampaugh was buying, Ochampaugh
purchased a drink for plaintiff and two for himself.
Ochampaugh drank one of the drinks while stand-
ing by plaintiff. Plaintiff testified that it was
plainly visible that Ochampaugh was extremely
intoxicated at that time, which was around 11:00
P.M. According to plaintiff, Ochampaugh was lean-
ing on the bar and barstool and slurring his words.

William Ochampaugh testified that he felt like
he was getting intoxicated while he sat with

Merry Miller and her friends. He later went out to his car with Kevin Richardson and drank some more from the bottles he had in his car. He further testified that he continued to order and be served drinks after he came back into the bar. Ochampaugh said the trip to the car occurred before he saw plaintiff in the bar. He also said that he ordered some drinks while talking to plaintiff. Ochampaugh further testified that he ordered and was served drinks from the time he arrived until the time he finally left the bar.

Robert Fisk testified that he arrived at the defendant tavern between midnight and 12:30 A.M. Sometime after he arrived, Fisk walked out the back door of the bar, where he saw Ochampaugh and Peggy Winkleman in a car. He then saw them walk back into the bar, with Winkleman helping Ochampaugh walk. He also testified that he later saw Ochampaugh weaving, stumbling, and staggering and that Ochampaugh was "very visibly intoxicated." However, he never saw Ochampaugh served a drink. Fisk left the bar at approximately 1:30 A.M.

William Ochampaugh also testified that he purchased a half-gram of cocaine while at the bar, but that he did not consume any of it until after he had left. He said he and Winkleman shared the cocaine about five minutes before the vehicle accident.

Raymond Johnson, the bartender at the defendant tavern, testified that Ochampaugh came into the bar between 8:00 P.M. and 8:30 P.M. and that he served Ochampaugh two or three drinks between that time and 9:00 P.M., when the waitress came on duty. Johnson further testified that he thought Ochampaugh left the bar between 11:00 P.M. and 11:30 P.M. because he did not recall seeing Ochampaugh after about 11:30 P.M., when the bar

got busier because the second shift of a nearby factory let out at 11:00 P.M. and some of the workers came to the bar. He also testified that he did not remember seeing Ochampaugh from 9:00 P.M. to 11:30 P.M. Around 11:00 P.M. or 11:30 P.M., he had a conversation with Ochampaugh during which Ochampaugh said he had a bottle in his car and was going partying. While talking with Ochampaugh, Johnson observed that Ochampaugh's eyes were bloodshot. Johnson conceded that Ochampaugh may have been in the bar after 11:30 P.M.

Kim Kososky, the waitress on duty at the defendant tavern on the night in question, testified by deposition. She remembered nothing about that night. She did not remember whether it was busy or who was there that night. She remembered that plaintiff was there only because she heard about the accident the next day. Kososky testified that she does not know William Ochampaugh and would not know him if she saw him.

Plaintiff first argues that the trial court erred when it instructed the jury that the allegedly intoxicated person had to appear visibly intoxicated to an employee of the bar before liability could be imposed upon the dramshop defendant. We agree. During its deliberations, the jury sent out a question asking to whom Ochampaugh had to appear intoxicated. In response to the question the trial court instructed the jury as follows:

> You've asked about this question. Who does Mr. Ochampaugh have to be visibly drunk to? To whom is that appearance? And that would be to the employees at the bar. Did he appear to be visibly impaired at the time he was served or furnished the alcoholic beverage? Because that's the basis of liability that the bar owner or his employee sold or furnished to a person who ap-

peared to be visibly impaired, so it's not how it appeared to somebody else, but to the persons who are working there.

Outside the jury's presence, plaintiff objected to the trial court's response, stating that the standard is that visible intoxication is what would be apparent to an ordinary observer and is not limited to actual awareness of the person's visible intoxication by bar employees. The court responded that its interpretation of the dramshop act was that the bar employee had to be aware that the person was visibly intoxicated and therefore overruled plaintiff's objection. We agree with plaintiff that the trial court has misinterpreted the dramshop act.

The dramshop act, MCL 436.22; MSA 18.993, provides a cause of action against a dramshop that sells alcohol to a visibly intoxicated person where that sale is a proximate cause of the injuries sustained by the plaintiff. A person is visibly intoxicated when the person's intoxication would be apparent to an ordinary observer. *Heyler v Dixon,* 160 Mich App 130, 145-146; 408 NW2d 121 (1987).

Ultimately, the question presented to us is whether the dramshop act creates a subjective or objective standard of visible intoxication. Under an objective standard, whether the bar employee serving the allegedly intoxicated person was actually aware of the person's intoxication would be irrelevant, the question to be answered being whether an ordinary observer would notice that the person was visibly intoxicated. Therefore, under the objective standard, the bar employee should also have noticed the person's intoxicated condition and refused to serve the allegedly intoxicated person. Under a subjective standard, on the other hand, it would be necessary to show that the bar employee

who served the allegedly intoxicated person had personally observed that the intoxicated person was visibly intoxicated. Under the subjective standard, there would be no liability of the dramshop if its employee had not subjectively observed that the person being served was visibly intoxicated at the time the person was served.

We believe that the dramshop act establishes an objective standard. First, while this issue does not appear to have been directly addressed in prior cases, the objective standard is certainly consistent with the case law that has approved the definition of "visibly intoxicated" contained in SJI2d 75.02, that being that a person is visibly intoxicated when the person's intoxication would be apparent to an ordinary observer. *Heyler, supra* at 145-146. Furthermore, circumstantial evidence may be used to establish that the allegedly intoxicated person was visibly intoxicated. *Id.* at 146, and cases cited therein. If a subjective standard were adopted, requiring proof of what the bar employee actually observed, circumstantial evidence would be mostly irrelevant, because it would do little to establish what actual knowledge the bar employee had. Similarly, the subjective standard would not be consistent with the definition of a visibly intoxicated person, because the answer to the question whether the person would appear to be visibly intoxicated to an ordinary observer would not answer the question whether the bar employee actually observed the person to be visibly intoxicated. Finally, we note that no language in the dramshop act itself suggests an intent by the Legislature to create a subjective standard. That is, had the Legislature wished to create a subjective standard, it could have worded the dramshop act accordingly, such as stating that a cause of action would exist when an employee of the dram-

shop served a visibly intoxicated person where the employee knew the person was visibly intoxicated. The Legislature, in drafting the statute, however, created no such requirement.

Additionally, adoption of a subjective standard would essentially do away with the dramshop cause of action. That is, under a subjective standard, it would be virtually impossible for a plaintiff to establish his cause of action against the dramshop because only the bar employee who served the allegedly intoxicated person would ever know for a fact whether he (the bar employee) was aware that the person was visibly intoxicated. In order for the dramshop defendant to escape liability, the employee would merely have to testify that he was not personally aware that the allegedly intoxicated person was visibly intoxicated.

For that matter, the requirement that the allegedly intoxicated person be visibly intoxicated suggests an objective standard. That is, by imposing liability for serving a person who is visibly intoxicated, a duty is placed upon dramshops to avoid serving visibly intoxicated persons. Consistent with this duty is the obligation to ascertain whether a bar patron is visibly intoxicated and, therefore, that further service should be refused. It would make little sense to impose such an obligation on a dramshop and then allow the dramshop to escape responsibility by wilfully avoiding the determination whether a patron is visibly intoxicated. Rather, under the objective standard, if a patron is intoxicated to the point of being visibly intoxicated to an ordinary observer, the dramshop has the responsibility of observing this fact and refusing service. Because it is not unreasonable to expect that a bar employee should be at least as capable as an ordinary observer to determine that a person is visibly intoxicated, this is a reasonable burden

to place upon a dramshop in light of the legislatively expressed policy of holding dramshops responsible for serving visibly intoxicated persons.

For the above reasons, we conclude that the dramshop act embodies this objective standard and, therefore, that the trial court misstated the law in its supplementary instruction to the jury. Specifically, it is not necessary for the jury to determine that the allegedly intoxicated person appeared visibly intoxicated to a bar employee. Rather, it is only necessary for the jury to determine that the allegedly intoxicated person appeared visibly intoxicated to an ordinary observer and that the allegedly intoxicated person was served alcohol by the dramshop defendant while visibly intoxicated. Furthermore, in light of the jury's determination that the defendant dramshop did not serve Ochampaugh while he was visibly intoxicated, we cannot say that the trial court's instruction to the jury was harmless. Indeed, in light of the overwhelming evidence that Ochampaugh was visibly intoxicated and was served alcohol by the dramshop defendant while visibly intoxicated, it is fairly apparent that the jury took to heart the trial court's supplementary instruction and concluded that a bar employee had not personally observed Ochampaugh to be visibly intoxicated at the time of serving him alcohol.

This brings us to plaintiff's second argument, namely, that the jury's determination that the dramshop defendant had not furnished alcohol to Ochampaugh at a time when he was visibly intoxicated was against the great weight of the evidence. We agree with plaintiff that the jury's finding in this regard, while perhaps attributable to the erroneous instruction, was against the great weight of the evidence.

We review a trial court's decision not to grant a

new trial where it was alleged that the verdict was against the great weight of the evidence by determining whether the trial court abused its discretion. *Heshelman v Lombardi,* 183 Mich App 72, 76; 454 NW2d 603 (1990). In determining whether the verdict was against the overwhelming weight of the evidence, this Court should give deference to the trial court's unique ability to judge the weight and credibility of the testimony and should not substitute its judgment for that of the jury unless the record reveals a miscarriage of justice. *Id.*

We are satisfied that the jury's verdict was against the overwhelming weight of the evidence and that the trial court abused its discretion in denying a new trial. We have set forth at great length at the beginning of this opinion a summary of the testimony concerning Ochampaugh's drinking on the night in question, whether he was visibly intoxicated, and whether he was served alcohol by the defendant dramshop's employees while he was visibly intoxicated. The overwhelming weight of the evidence presented at trial compels the conclusion that Ochampaugh was visibly intoxicated and that he was served alcohol while in a visibly intoxicated condition.

No fewer than seven persons, including Ochampaugh himself, testified regarding Ochampaugh's intoxicated condition. Most of those witnesses also testified that Ochampaugh had been served while visibly intoxicated. The only contrary evidence was that of the bartender and the waitress. The bartender testified that he could not remember seeing Ochampaugh after 9 P.M., except for one occasion around 11:00 P.M. to 11:30 P.M. The waitress testified that she remembered nothing about the evening, remembered that plaintiff was at the bar only because she had heard about the accident the following day, and does not know Ochampaugh

and would not recognize him if she saw him. This evidence hardly establishes that Ochampaugh was not visibly intoxicated or was not served. Rather, the overwhelming weight of the evidence only allows for one conclusion, that Ochampaugh was visibly intoxicated and was served while visibly intoxicated. The jury's determination to the contrary, while perhaps attributable to the trial court's erroneous instruction, was nevertheless against the great weight of the evidence. Accordingly, the trial court should have granted plaintiff a new trial against the dramshop defendant.

Plaintiff also argues that the jury award of $30,000 for future noneconomic damages was grossly inadequate and against the great weight of the evidence in view of the medical testimony presented. Plaintiff argues that the inadequacy of the verdict should shock our judicial conscience. However, the Supreme Court, in the context of remittitur rather than additur, has held that the "shock the conscience" test should no longer be applied in reviewing a jury award. *Palenkas v Beaumont Hosp*, 432 Mich 527; 443 NW2d 354 (1989). Rather, objective criteria must be applied relating to the actual conduct of the trial or the evidence adduced to determine if an adjustment should be made to the jury award. *Id.* at 532-533. Furthermore, the trial court's decision will not be disturbed absent an abuse of discretion. *Id.* at 533. Because plaintiff only argues that the verdict was grossly inadequate and should shock our conscience, and the "shock the conscience" standard is no longer appropriate, there is no basis left for us to determine that the trial court abused its discretion in denying additur. Accordingly, we leave the trial court's decision in this regard undisturbed.

Plaintiff next argues that the trial court erred in restricting the testimony of plaintiff's expert toxi-

cologist concerning his opinion with regard to Ochampaugh's likely blood alcohol content while at the tavern. It is within the trial court's discretion to admit or exclude expert testimony. *Beattie v Firnschild,* 152 Mich App 785, 794; 394 NW2d 107 (1986). We have carefully reviewed this matter and are not persuaded that the trial court abused its discretion in restricting the expert testimony.

Plaintiff next argues that the trial court erred in giving SJI2d 6.01 in charging the jury with regard to plaintiff's comparative negligence on the basis of plaintiff's refusal to execute a release of medical records to allow full discovery by the defendants. Inasmuch as we have concluded that plaintiff is entitled to a new trial with regard to the first issue and because this issue will not necessarily reoccur on remand, we decline to address this issue at this time.

Finally, plaintiff argues that the trial court erred in concluding that the so-called tort reform statute, MCL 600.6301 *et seq.*; MSA 27A.6301 *et seq.,* applies to the case at bar. Specifically, plaintiff argues that the tort reform statute should not apply to dramshop actions and that §§ 6303, 6305, and 6306 should not apply to automobile negligence actions.

With respect to the claim that the tort reform statute should not apply to dramshop actions, plaintiff's position is contrary to the clear language of the dramshop act itself. MCL 436.22(12); MSA 18.993(12) expressly provides that, except as otherwise provided under the dramshop act, a civil action under the act against a retail licensee is subject to the provisions of the Revised Judicature Act, MCL 600.101 *et seq.*; MSA 27A.101 *et seq.,* of which the tort reform statute is a part. Thus, except where the dramshop act has a specific provision that contradicts the provisions of the

Revised Judicature Act, a dramshop action falls within the provisions of the Revised Judicature Act, including the tort reform statute. While plaintiff has indicated a number of provisions in which the dramshop act allegedly contradicts the provisions of the Revised Judicature Act, there is no indication that those contradictions are applicable to the case at bar. Thus, under the explicit terms of the dramshop act itself, the tort reform statute does apply to dramshop actions, except to the extent that the dramshop act itself creates a contrary requirement.

Plaintiff also argues that the tort reform statute, particularly §§ 6303, 6305, and 6306, should not apply to an automobile negligence action. Those sections relate to the reduction of a damage award by an amount received from a collateral source, as well as requirements concerning specific findings the jury must make and the form of the order to be entered on the verdict by the court. While there does appear to be some question with regard to the applicability of certain provisions of the tort reform statute to automobile negligence cases, see Introductory Directions to the Court, SJI2d, ch 36, p 5-23, plaintiff has failed to show how the tort reform statute was applied to plaintiff's detriment in the case at bar. With respect to § 6303, the collateral source provision, there is no indication from the record that plaintiff's award was reduced because of the collateral source provision of the tort reform statute.

With regard to the other two sections, which require certain specific findings by the jury and provisions in the judgments with respect to various kinds of past and future damages, while it appears that these provisions were applied in the case at bar, in that the verdict form and judgment contained the specific breakdown of damages re-

quired under the tort reform statute, we fail to see how such specificity worked to plaintiff's detriment. Presumably, the jury would have reached the same finding with regard to the total damages regardless of whether a general verdict form or specific verdict form was utilized. Accordingly, there was no prejudice to plaintiff by requiring specific findings on damages.

Because application of those portions of the tort reform statute to which plaintiff objects do not appear to have worked to plaintiff's detriment in the case at bar, we decline to consider whether those provisions are, in fact, applicable to automobile negligence actions.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Costs may be taxed by defendants Ochampaugh only, being the only parties to have prevailed in full.