CAVANAGH, J.
(dissenting). This case is about male employees sexually harassing a female employee and an employer that did very little to try to make it stop. This case is not about plaintiffs counsel’s “routine” behavior, contrary to the assertions of the majority. Ante at 776-777. Whatever plaintiffs counsel may have done in past cases is irrelevant to this particular case. In this case, an objective review of the evidence indicates that plaintiff overwhelmingly provided facts to prove that she was sexually harassed and that defendant conducted an inadequate investigation into this harassment. Defendant’s inadequacies in the work place continued in the courtroom as it selected a trial strategy intended to “blame the victim” for the harassment that *794 occurred. Defendant’s repeated errors in judgment should not now be redressed by this Court.
The majority remands this matter for a new trial because it asserts that the trial court abused its discretion in denying defendant’s motion for a new trial. The majority claims that “it should have been apparent to the trial court that the persistent and calculated efforts of plaintiffs trial counsel to thwart the jury’s fact-finding role had borne fruit.” Ante at 793.1 disagree and believe there was substantial admissible evidence for the jury to hold defendant liable. Therefore, I respectfully dissent.
I. EVIDENCE OF HARASSMENT AND THE CONDUCT OF PLAINTIFF’S COUNSEL
The majority states that “the jury’s verdict unmistakably reflects passion rather than reason and prejudice rather than impartiality.” Ante at 755. I disagree. The standard for reviewing defendant’s motion for a new trial, MCR 2.611, is the abuse of discretion standard. Brown v Arnold, 303 Mich 616, 627; 6 NW2d 914 (1942). An abuse of discretion occurs “only when the result is so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias.” Alken-Ziegler, Inc v Waterbury Headers Corp, 461 Mich 219, 227; 600 NW2d 638 (1999) (citations and internal quotation marks omitted). While the majority clearly disagrees with the verdict, there was ample testimony from numerous witnesses to support the jury’s verdict that plaintiff, the first and only female millwright for a lengthy period at defendant’s plant, was the victim of sexual harassment and that defendant *795 did not engage in an adequate investigation or remedial action to stop this harassment.
An employee in defendant’s human resources department testified that the investigation into plaintiffs sexual harassment claims was inadequate.[1] Another employee in defendant’s human resources department testified that without being given a name he would not even know where to begin a sexual harassment investigation. Yet another employee in the human resources department testified that she told plaintiff she would provide her with the name and number of a union representative who might be helpful, but the name and number were never provided to plaintiff because the employee never saw plaintiff again.[2] Defendant’s corporate representative at trial, who was also one of plaintiffs supervisors, conveyed to the jury that defendant’s investigation essentially consisted of passing out defendant’s sexual harassment policy and asking the men if *796 they harassed plaintiff or knew who did.[3] The trial representative said he approached some of the men as a group and asked if they knew who was sexually harassing plaintiff. He also said he hoped someone else would do the investigating and that he did not feel it was his responsibility to investigate.[4] The trial representative *797 later testified that asking the men if they knew who was responsible for the incidents was inadequate. He further stated that he did not know of any other investigation that was done.
An employee who worked for defendant for thirty-one years testified that he had never seen anyone treated like plaintiff. He stated, “She was relentlessly pounded with derogatory statements, with no help when she was given a job, and there were several people involved on the same job. She would not get a lot of cooperation. She was just basically resented that she was a woman, making a man’s wage.” The employee also testified that plaintiff was subjected to physical danger by not getting the cooperation she needed, and that other millwrights received, when doing her work. Although millwrights commonly work in pairs, she was often forced to work alone. He testified that this abusive conduct occurred nearly every day, was devastating to plaintiff, and was readily apparent to plaintiffs supervisors. He also testified that supervisors made offensive comments as well. This employee drove plaintiff home from work for a period and testified she cried at least one hundred times on the way home from work. “She never knew what to expect on any given day that she went into work ....” He also testified that the stench of urine from a chair in an area set off for plaintiff made it evident that someone had urinated on it. Further, the *798 employee stated that he did not observe any of defendant’s employees try to stop the harassment.
Plaintiff testified that when she went to work each day she “never knew what to expect.” She said abusive comments were essentially an everyday occurrence, and she said she was isolated and ostracized at work. Plaintiff stated that the conduct made her afraid and angry and that she had problems sleeping. She also experienced headaches, stomach problems, and problems associated with her asthma. Plaintiff said she felt hopeless and attempted suicide because she could not get any cooperation or help from defendant.[5] Regarding her suicide attempt, plaintiff said “that’s what I did and I regret it, but I just felt pushed to that point where I couldn’t take it anymore.” Plaintiff said she felt torn up inside and that the harassment was an assault to her *799 person. Plaintiff said she began drinking “to escape” and help dull her feelings. Plaintiff testified that the abusive comments were still being made at the time of the trial, but she was not going to quit over the harassment; she refused to be driven out of her job.
I believe even this limited testimony indicates that there was ample evidence to support the jury’s verdict, and I disagree that the verdict was the result of plaintiffs counsel’s inflaming the jury with “hyperbolic rhetoric, prejudice-baiting argument, and unscientific expert testimony.” Ante at 770. Plaintiffs counsel vigorously pursued this case; however, defense counsel’s approach was no less vigorous.
Although defense counsel’s strategy ultimately proved to be ineffective, and although the majority certainly disagrees with the verdict, it does not necessarily mean that plaintiffs counsel behaved inappropriately. A thorough review of defense counsel’s conduct during trial illustrates that defense counsel’s strategy was inadequate and, at times, disingenuous.
For example, defense counsel tried to characterize some of the men alleged to have engaged in the harassment as “ornery” and she referred to one as “basically a good guy.” She tried to characterize their comments as “shop talk”[6] or “a slip of the tongue,” and their conduct as “horseplay.”[7] She repeatedly questioned plaintiff about whether she reported harassing incidents to *800 supervisors while plaintiff continually testified that the supervisors were standing right next to her during the incidents.[8] When plaintiff testified that a coworker was snidely telling other employees to watch what they were saying or it would be labeled sexual harassment, defense counsel tried to characterize the coworker as being helpful by merely instructing other people about what is appropriate. Regarding an article about men and sperm left near plaintiffs soda can, defense counsel attempted to minimize the incident because the article was in a scientific magazine.
Defense counsel questioned plaintiff about plaintiffs alleged failures to keep abreast of defendant’s investigations. Defense counsel also repeatedly alluded to the fact that plaintiff knew who was harassing her, even though plaintiff repeatedly said she did not know for certain and she did not want to falsely accuse someone. Defense counsel argued, “She [plaintiff] thought it was more important to protect whoever it was that was *801 responsible.”[9] Regarding plaintiff, defense counsel argued, “There is absolutely nothing wrong with her.” Consistent with the strategy that plaintiff was responsible for the continued mistreatment, defense counsel asked witnesses if plaintiff was a “tomboy” and she also questioned whether plaintiff had “put herself in a position of being in a profession that has historically been dominated by me[n].”
During closing argument, defense counsel brought up private incidents relating to plaintiff that occurred over twenty years ago, even though plaintiff did not begin working with defendant until 1992. She argued the only problem plaintiffs coworkers had with plaintiff related to her alcoholism. “They never had a problem with Ms. Gilbert as a female.” Defense counsel’s theme was to blame the victim. This was demonstrated in a statement she made indicating that plaintiffs “medical records also reflect that she has a tendency to blame everyone else for her problems, rather than look directly at her problems.”
The majority criticizes the conduct of plaintiffs counsel; however, a thorough review of the trial transcripts and lengthy closing argument finds sparse objections made by defense counsel and no impropriety justifying a new trial. Regarding statements made by plaintiffs counsel during closing argument, he first stated that plaintiff thanked the jury for allowing her to exercise her right as an American citizen to have her day in court. Plaintiffs theme during closing argument was that plaintiff had great fortitude to withstand the *802 harassment. Plaintiff had repeatedly testified that she was not a quitter, she had every right to work at the plant, and she was not going to let them run her out. Plaintiffs counsel referenced the strength of those who were affected by the Holocaust. He also referenced Prometheus and Zeus, and stated that the myth of the eagle pecking at Prometheus’s liver for all eternity reminded him of plaintiffs ordeal. He compared plaintiff to Rosa Parks and Arthur Ashe, as well as a dog that was kicked and abused every day. He even referred to plaintiff as a pioneer. When reviewing the closing argument in context, it is obvious that plaintiffs counsel was arguing that plaintiff was courageous and determined. Contrary to the majority’s assertion, plaintiffs counsel was no more likening plaintiff to the Holocaust victims than he was likening her to a figure in Greek mythology being pecked by a bird.
Plaintiffs counsel also appropriately stated that defendant should be judged just as any individual would be judged. And he stated that the jury could not punish defendant; it could only compensate plaintiff for the harm suffered. While plaintiffs counsel did refer to “torture” and “beating plaintiff down,” the jury heard weeks of testimony and was aware that no evidence of physical abuse was introduced. Defense counsel obviously did not think the phrases were inflammatory because there was no objection raised. To suggest, as the majority does, that the jury was somehow influenced or confused by these random phrases during closing arguments is insulting to the jurors’ intelligence.
The majority’s blanket statements about plaintiffs counsel belie the truth of the record. Plaintiffs counsel no more played on the prejudices of the jury because defendant was a German company than he played on *803 the prejudices of the jury because he hoped the jury liked dogs, tennis players, or well-known pioneers such as Lewis and Clark. While plaintiffs counsel’s comments are highlighted by the majority, the references were miniscule in the context of the entire trial. The majority hopes that by merely stating that these references were “naked appeals to entice the jury to consider its passions and prejudice,” ante at 755 n 1, it can magically transform the events that occurred at trial. However, a review of the whole record reveals that the majority’s approach misstates the events at trial.
The majority states, “Overreaching, prejudice-baiting rhetoric appears to be a calculated, routine feature of counsel’s trial strategy.” Ante at 776-777.1 do not know if that statement is accurate. But what I do know is that it is not an accurate statement in this case. No matter what plaintiffs counsel’s routine may be, this Court should focus only on the facts before us. An impartial review of those facts indicates the behavior of plaintiffs counsel does not warrant a new trial.
II. EXPERT WITNESS TESTIMONY
I agree with the majority that “MRE 702 has imposed an obligation on the trial court to ensure that any expert testimony admitted at trial is reliable.” Ante at 780. However, I disagree that the trial court erred in failing to conduct its gatekeeper role in this case.
Stephen Hnat, a fact and expert witness called by plaintiff, testified that he is a clinical social worker, which means he is licensed to perform psychotherapy —both group therapy and individual therapy— primarily for people who have substance abuse disorders, or depressive or emotional disorders. He has worked as a clinical social worker since 1981. Among *804 other positions, Mr. Hnat served as staff therapist and the director of cocaine treatment for Ford Hospital-Maplegrove.
During his testimony, Mr. Hnat clarified that he is not a doctor and that he did not complete his Ph.D. Unlike the majority, I do not find any evidence that Mr. Hnat’s misstatement that he possessed a master’s degree was intentional. Mr. Hnat entered a doctorate program that he did not complete. It is not unreasonable that, twenty years later, he was unclear about whether he had completed the required paperwork to be awarded his master’s degree. I also do not find that, in light of Mr. Hnat’s other credentials, the misstatement affected the jury verdict. Mr. Hnat detailed a lengthy career that included consulting with the Michigan Department of Transportation, as well as the Detroit Red Wings, Detroit Tigers, Detroit Lions, and the University of Michigan Athletic Department. Mr. Hnat also served as a consultant to the National Institute of Drug Abuse and served on the President’s Task Force for a Drug-Free Workplace. He also conducted research over the years and authored an award-winning video used by numerous corporations. Further, he served as an instructor at the Michigan Judicial Institute and as an adjunct professor at the University of Detroit Mercy. During direct examination, plaintiffs counsel and Mr. Hnat were forthcoming about their past working relationship.
Mr. Hnat first treated plaintiff in 1992. He testified that there is a withdrawal period when an alcoholic stops drinking. The withdrawal period depends on the person and how much the person drank, but “if you stop using alcohol very quickly, your body can be, the brain is overstimulated and you can develop some serious life-threatening complications at that time.” Mr. Hnat also testified:
*805 Alcoholism is, you know, is a progressive disease which ultimately is fatal and it’s fatal in a number of different ways unless it’s arrested hut then it’s not fatal but the way that alcoholics or people with addiction generally die are associated with overdoses, accidents because of the effect of the drug and the functioning of the environment. More often than not it’s a very slow and painful process as the body begins to break down because of the toxic effects of the chemical, so in the case of alcoholics, the process of dying usually involves the development of some very painful medical complications such as pancreatitis or hepatitis or cirrhosis.[10]
He further explained that alcoholism “continues to capture more of the brain’s functions so that the person is, you know, the brain, it becomes more and more focused on getting and using the drug.”
Unlike the majority, I do not find this testimony “utterly lacking in scientific support.” Ante at 766. In short, Mr. Hnat’s testimony was that plaintiff was an alcoholic. Stress related to the sexual harassment she suffered while employed by defendant caused plaintiff to start drinking again and suffer from depression, which also exacerbated her drinking.[11] As an alcoholic suffering from depression, plaintiff may die from a disease common to alcoholics. Mr. Hnat testified that “for the person who has alcoholism, that kind of stress *806 [from sexual harassment] produces an additional risk not only of emotional distress but of triggering a process of compulsive drug seeking. That the person will, they feel bad, and that sort of natural connection of the brain is I feel bad. I feel like drinking.” Medical records signed by various medical professionals indicate that plaintiff suffered “extreme stress in her work environment due to sexual harassment.” I do not believe that the trial court abused its discretion in admitting Mr. Hnat’s testimony.
III. REMITTITUR
The jury found that plaintiff had been subjected to sexual harassment in violation of the Michigan Civil Rights Act, MCL 37.2101 et seq., and that defendant did not adequately investigate and take prompt and appropriate remedial action. The jury awarded $20 million for mental anguish, physical pain and suffering, fright and shock, denial of social pleasures and enjoyments, embarrassment, humiliation, mortification, shame, anger, chagrin, disappointment, worry, outrage, disability including the loss or impairment of plaintiffs psychological well-being, and the increase in plaintiffs disease of substance abuse arising from an aggravation of a preexisting condition. The jury also awarded $1 million in a trust fund for plaintiff to use for future medical expenses; contrary to the majority’s assertion, when the jury verdict was read, the jury did not state that this amount was for future earning capacity.
As stated, I believe that the jury’s verdict for the plaintiff was amply supported by testimony offered at *807 trial. I also disagree with the majority’s statement that “we cannot accept the argument that plaintiffs was the worst case of sexual harassment in the history of the country that has resulted in a verdict.” Ante at 769. Plaintiff does not have to prove that her case was the worst case of sexual harassment in the history of the country to support the verdict. However, the verdict must be properly supported by the evidence and reviewed to determine
whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; [2] whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; [3] whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions. [Palenkas v Beaumont Hosp, 432 Mich 527, 532; 443 NW2d 354 (1989).]
On the basis of the evidence introduced at trial and awards in other sexual harassment cases, as detailed by the majority, I believe that the jury award in this case is too great. See id. at 538-540; Precopio v Detroit, 415 Mich 457, 479; 330 NW2d 802 (1982). While defendant’s conduct was reprehensible and plaintiffs suffering indisputable, a review of jury awards in other sexual harassment cases indicates that the jury’s award in this case was inappropriate. While a review of other awards cannot serve as an exact indicator and circumstances may certainly justify higher awards than those granted by other juries, the disparity between this award and others involving a single plaintiff indicates that it is not analogous.
I stress, however, that I do not believe the matter should be remanded for remittitur on the basis of any misconduct on the part of plaintiffs counsel. The excessively large verdict in plaintiffs favor is attributable *808 solely to the conduct of defendant and defense counsel.[12] In an ironic exchange during the trial, plaintiffs counsel actually predicted the outcome of the case after defense counsel requested a jury instruction regarding plaintiffs lack of mitigation. Defense counsel stated that plaintiff was causing her own medical problems and “could have ameliorated the later incidents [of sexual harassment] which could have harmed her.” Plaintiffs counsel stated that defense counsel’s argument that plaintiff is responsible for her damages
is going to pump up the damages in this case when they start blaming [plaintiff]. So, I want the record to reflect I am acceding to this on behalf of my client because it is my firm belief that this would increase the amount of damages that is awarded to my client, rather than decrease them.... And I just want to make a record. If we get an astronomical verdict and the Defendant comes back and asks for a remittur [sic], Judge, I want the record to reflect that the Defendant is requesting an instruction that I think would have the effect of further angering the jury and increasing the damages.
While I find plaintiffs counsel’s prescience impressive, the excessively high verdict cannot be allowed to *809 stand merely because plaintiffs counsel made a record of defense counsel’s woeful error in strategy. Therefore, I would remand this matter to the trial court for remitti-tur.
m CONCLUSION
Defendant’s trial strategy was to question, and minimize, the harassment experienced by plaintiff and blame plaintiff for not being more active in seeking to stop the harassment. This strategy was chosen by defendant and rejected by the jury. Conduct by plaintiffs counsel that is now classified as unacceptable was frequently not objected to by defendant. I do not believe that this Court should now step in to help defendant correct its errors in judgment. Therefore, I respectfully dissent.
Weaver and Kelly, JJ., concurred with Cavanagh, J.

Q. But we all know that you didn’t do any investigation?
A. Not adequately. Yes. As has been brought out here.
Q. After the Polaroid penis, you did nothing, am I correct, you did nothing, you decided you did everything you could do and you decided not to take any further action, correct.
A. That’s what we decided.

Q. And you actually never did give Linda [plaintiff] that number because you didn’t see her again am I correct?
A. That is correct.

Q. And if somebody didn’t come forward to you, apparently, and tell you that they saw so and so do it, that was it?
A. Working with the frame of the union, the local agreements, that’s it.
Q. And you’re claiming—by the way, with regard to this [the March 1995 incident, which was the poem “The Creation of a Pussy”] that’s the only thing that you know of that-or the only claim quote unquote investigation that you did was ask the men whether they knew who did it; is that what you claim?
A. Yes, sir.
Q. Okay. Now you didn’t do it in a systematic fashion, did you?
A. As far as questioning the men?
Q. Right.
A. No, I did not.
Q. You just as you could run into them?
A. As I approached them, yes.

 Regarding later incidents, the trial representative testified:
Q. Since you felt that you expected Chrysler [defendant] would assign the lawyers or somebody else to investigate Linda’s [plaintiffs] sworn statement regarding the continued and unabated acts of harassment between 1992 and November 4 of 199—on November 3,1994 when her statement was taken, did you *797 ever see anybody from Chrysler assigned to investigate these claims—not you but somebody else, as a result of the statement?
A. No, I did not.
Q. So when you said you would have expected the lawyers to do it, even though you expected it apparently nobody at Daimler Chrysler did it, am I correct?
A. Not that I’m aware of.

 Plaintiff testified:
And I tried to do something about it, and nothing got done about it. People saw what was happening. Nobody would do anything. Nobody would help me.
I turned things in. There was a, in my opinion, there was a slight attempt at, perfunctory attempt at making a report. After those things were turned in, the guys laughed about it. They thought it was a big joke. The first thing that got turned in. It was a week and a half later that the second thing, picture of the penis was on my tool box.
So, that showed how serious they took everything.
Plaintiff also testified that when she reported that “BITCH” was written on masking tape and fastened to her toolbox, she was told by a supervisor not to show that it bothered her and the harassment may stop. Plaintiff was also told that changing her clothes in a certain location, which was enclosed, was “drawing attention to” herself.

 Plaintiff testified she “was called a fucking cunt, whore, bitch, drunk ass, pussy.”
Defense counsel then asked witnesses if words like bitch or cunt were appropriate as “shop talk.”

 Contrary to defense counsel’s characterization, an employee in defendant’s human resources department stated that a reasonable person would find the cartoons and pictures offensive. Another said he considered the penis photograph to be sexual harassment.

A. [The supervisors h]ad been standing in the group of people with him speaking that way, yes.
Q. And did you at any time ask either of them why they are permitting this individual to address you in such fashion?
A. No, I didn’t.
Q. Then, how can you be certain they heard what you heard?
A. Because they were right there.
Q. What do you mean by right there, shoulder-to-shoulder with you?
A. We were all in a group. I mean, they weren’t far enough away where they were out of earshot.

 Defendant’s records, however, indicate that plaintiff did not know who was responsible for leaving harassing items. For example, defendant’s records on October 10, 1994, state, “She [plaintiff] also stated she know [sic] it is a maintenance employee and she can only guest [sic] at this time because she hasn’t seen them doing this.”

 Medical records listed various medical conditions suffered by plaintiff, including chronic pancreatitis.

 Plaintiff testified:
It [the harassment] just got worse. And being an alcoholic, sometimes that is the way we cope with things is by going back to the bottle and that is what I did.
I belief [sic] that the daily abuse that I have been subjected to at work has hindered me greatly in being able to remain sober.
*806 In contrast, defense counsel suggested that plaintiffs depression was not the result of repeated sexual harassment at work, but could have been the result of having to depend on other people for transportation.

 In a telling exchange, an employee of the human resources department attempted to dismiss plaintiffs complaints of sexual harassment.
Q. She did actually complain to you that she had been the victim of harassment, didn’t she?
A. Complained no. It was more upon [sic] a conversation.
A. Like a factfinding thing, like she wants to know what she could do, what avenues she could take, that sort of thing.
Q. So she was asking you for advice on what she should do?
A. Yes.